## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRECKENRIDGE PHARMACEUTICAL, INC.<br><br>        Plaintiff,<br><br>v.<br><br>HETERO USA, INC., HETERO LABS LIMITED UNIT-III, HETERO LABS LIMITED, and CAMBER PHARMACEUTICALS, INC.<br><br>        Defendants. | C.A. No. 24-0571-GBW |

## <u>JOINT CLAIM CONSTRUCTION BRIEF</u>

RICHARDS, LAYTON & FINGER, P.A.
Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
metzler@rlf.com

*Attorneys for Plaintiff Breckenridge*
*Pharmaceutical, Inc*


Dated:  May 5, 2025

MORRIS JAMES LLP
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Ave., Ste. 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants*
*Hetero USA Inc., Hetero Labs III,*
*Hetero Labs Limited and*
*Camber Pharmaceuticals, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... v

TABLE OF EXHIBITS ........................................................................................................... vi

I.      INTRODUCTIONS AND BACKGROUND ................................................................... 1

        A.      Plaintiffs' Introduction ...................................................................................... 1

                (1)     The Parties ............................................................................................... 1

                (2)     The Patents in Suit .................................................................................. 1

                (3)     Background on Solid Oral Dosage Forms with Dabigatran Etexilate
                        Mesylate .................................................................................................. 1

        B.      Hetero's Introduction ......................................................................................... 4

        C.      Hetero's Sur-Reply Introduction ....................................................................... 5

II.     DISPUTED CONSTRUCTIONS ................................................................................... 7

        A.      "Two Distinct Types of Particles" ...................................................................... 7

                (1)     Plaintiff's Opening Position ................................................................... 7

                        a.      The Claims ................................................................................... 8

                (2)     Hetero's Answering Position ................................................................ 10

                        a.      Breckenridge's construction is unsupported by the intrinsic
                                evidence. ................................................................................... 10

                        b.      The intrinsic evidence supports Hetero's construction. ............ 12

                                i.       The specification supports Hetero's construction. ............ 12

                                ii.      During prosecution, Breckenridge repeatedly and
                                         consistently described the particles of acid and
                                         particles of dabigatran to not be in contact. ...................... 13

                        c.      Alternatively, "two distinct types of particles" renders the
                                claims indefinite. ...................................................................... 18

                                i.       "Two distinct types of particles" is indefinite if it is
                                         not construed according to Hetero's proposed
                                         construction. ...................................................................... 18

|  |  |  | ii. | "Two distinct types of particles" is indefinite if it is construed according to Breckenridge's proposed construction. | 20 |

(3) Plaintiff's Reply ................................................................... 20

    **a.** Hetero's Summary of the Use of a Lubricant in the Patents is Unsupported ............................................................ 21

    b. Distinguishing a Two Particle Design from the Prior Art Single Particle Design During Prosecution Did Not Disavow Claim Scope .................................................. 23

    c. Hetero's Representations of the Prosecution History are Misleading ...................................................................... 24

    d. The Intrinsic Record Provides Ample Information Defining the Scope of the Claimed Inventions ............................... 27

    e. Hetero's Indefiniteness Arguments Are For Another Day .......... 27

(4) Hetero's Sur-Reply ............................................................... 28

    a. Breckenridge's prosecution admissions confirm that dabigatran and acid particles are physically separate. ................. 29

    b. The claim language further belies Breckenridge's purported "construction" ......................................................... 32

    c. Indefiniteness is ripe for decision. ................................... 32

B. The "Free From" Terms ............................................................ 33

(1) Plaintiff's Opening Position ...................................................... 33

    a. "the first type of particles is free from" ........................... 34

        i. The Claims ................................................................ 34

        ii. The Specification ...................................................... 35

        iii. The File Wrapper ...................................................... 36

        iv. Analysis ................................................................... 37

    b. ". . . and is free from dabigatran etexilate" ....................... 37

(2) Hetero' Answering Position ...................................................... 38

    a. Breckenridge's construction is overbroad and unsupported by the intrinsic evidence. ............................................. 39

b. The intrinsic evidence supports Hetero's construction. ................ 41

    i. The claim language requires that the entire dabigatran particle must be "free from" acid, and vice versa. ........................................................................ 42

    ii. The specification is clear that the dabigatran and acid to not be in contact, and disparages prior art solutions where the dabigatran and acid are on the same particle. ........................................................................ 43

    iii. Breckenridge told the Patent Office that its claim compositions did not have dabigatran and acid on the same particle. ................................................................ 45

(3) Plaintiff's Reply .................................................................................. 46

a. The Intrinsic Record Does Not Support Hetero's Construction ......................................................................... 47

b. Hetero's Resort to Other Patents Using "Free From" Is a Distraction ............................................................................ 49

(4) Hetero's Sur-Reply ............................................................................ 51

a. The intrinsic evidence supports Hetero's construction. ................ 51

b. Breckenridge's prosecution disclaimer defeats its construction. ......................................................................... 52

c. No district court, including in King Pharms, has agreed with Breckenridge's proposed construction. ................................... 53

C. The "mixing" and "a mixture of" Terms ............................................................. 53

(1) "mixing the first type of particles and the second type of particles with the at least one pharmaceutically acceptable excipient" of Claim 6 ............... 54

(2) "a mixture of [two distinct types of particles]" of Claims 11 and 16 ....... 54

(3) Plaintiff's Opening Position ................................................................ 55

a. The Claims .................................................................................. 55

b. The Specification ...................................................................... 56

c. Analysis ..................................................................................... 57

(4) Hetero's Answering Position ............................................................... 57

a.    Breckenridge's construction is overbroad and unsupported by the intrinsic evidence. ................................................. 58

b.    The intrinsic evidence supports Hetero's construction. ................ 60

i.    The claims require an excipient external to the acid and dabigatran particles. ................................................. 60

ii.    The specification confirms that the excipient is external to the two particles. ............................................. 61

(5)    Plaintiff's Reply ....................................................................... 61

a.    The Claims ......................................................................... 62

b.    The Specification .............................................................. 63

(6)    Hetero's Sur-Reply ................................................................. 64

a.    "mixing/mixture of" has no special meaning in the intrinsic evidence or the art. ........................................................ 64

b.    Hetero's proposed construction does not exclude any embodiments. ..................................................................... 64

# TABLE OF AUTHORITIES

Page(s)

CASES

*Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.*,
   No. 20-985-RGA, 2022 WL 1026983 (D. Del. Apr. 6, 2022)................................................40

*Aktiebolaget Karlstads Mekaniska Werkstad v. U.S. Int'l Trade Comm'n*,
   705 F.2d 1565 (Fed. Cir. 1983)..........................................................................................52

*Aventis Pharms. Inc. v. Amino Chems. Ltd.*,
   715 F.3d 1363 (Fed. Cir. 2013)............................................................................................8

*Baxter Healthcare Corp. v. Nevakar Injectables, Inc.*,
   Nos. 12-1184-CJB, 21-1186-CJB, 2023 WL 4175261 (D. Del. Jun. 26, 2023)....58, 59, 60, 61

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
   616 F.3d 1249 (Fed. Cir. 2010)......................................................................................58, 60

*Bioavail Laby's Int'l SRL v. Impax Laby's., Inc.*,
   433 F. Supp. 2d 501 (E.D. Pa. 2006) ...................................................................................42

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
   713 F.3d 1090 (Fed. Cir. 2013)...........................................................................................46

*Cumberland Pharms. Inc. v. Sagent Agila LLC*,
   No. 12-825-LPS, 2013 WL 5913742 (D. Del. Nov. 1, 2013).................................................42

*Datacore Software Corp. v. Scale Computing, Inc.*,
   C.A. No. 22-535-GWB, 2023 WL 5207928 (D. Del. Aug. 14, 2023)..............................27, 49

*Exigent Tech., Inc. v. Atrana Sols., Inc.*,
   442 F.3d 1301 (Fed. Cir. 2006)........................................................................................6, 10

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
   64 F.3d 1553 (Fed. Cir. 1995).............................................................................................11

*Fenner Invs., Ltd. v. Cellco P'ship*,
   778 F.3d 1320 (Fed. Cir. 2015)......................................................................................18, 51

*Gen. Elec. Co. v. Int'l Trade Com'n*,
   685 F.3d 1034 (Fed. Cir. 2012)......................................................................................39, 53

*Graham v. John Deere Co. of Kan. City*,
   383 U.S. 1 (1966)...............................................................................................................40

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008)...........................................................................................39

*Hill-Rom Servs. v. Stryker Corp.*,
   755 F.3d 1367 (Fed. Cir. 2014).........................................................................................28

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
   381 F.3d 1352 (Fed. Cir. 2004).........................................................................................26

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*,
   540 F.3d 1337 (Fed. Cir. 2008).........................................................................................41

*Int'l Rectifier Corp. v. IXYS Corp.*,
   361 F.3d 1363,1374 (Fed. Cir. 2004)................................................................................50

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001)...........................................................................................8

*K-2 Corp v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999).........................................................................................33

*King Pharms. Inc. v. Purdue Pharma L.P.*,
   718 F. Supp. 2d 703 (W.D. Va. 2010) .................................................................... *passim*

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995)........................................................................................6, 55

*Medicis Pharm. Corp. v. Actavis Mid Atl. LLC*,
   No. 11-409-LPS-CJB, 2012 WL 2126873 (D. Del. June 12, 2012)....................................6

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011)............................................................................................................47

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
   831 F.3d 1350 (Fed. Cir. 2016).........................................................................................56

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)..........................................................................................................27

*Nippon Shinyaku Co., Ltd. v. Sarepta Therapeutics, Inc.*,
   2023 WL 4314485 (D. Del. July 3, 2023) (D. Del. July 3, 2023) ...................................55, 63

*Oak Tech. Inc. v. Int'l Trade Com'n*,
   248 F.3d 1316 (Fed. Cir. 2001).........................................................................................39

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003).........................................................................................45

*Openwave Sys., Inc. v. Apple Inc.*,
   808 F.3d 509 (Fed. Cir. 2015).........................................................................................43

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ..................................................................8, 12, 13

*Purdue Pharm. Prods. L.P. v. Actavis Elizabeth LLC*,
   No. 12-5311 (JLL)(JAD), 2015 WL 5032650 (D.N.J. Aug. 25, 2015) ......................42, 58, 60

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001)...................................................................................43, 44

*Smartmetric, Inc. v. Am. Express Co.*,
   476 Fed. Appx. 742 (Fed. Cir. 2012) ...................................................................................33

*SpeedTrack, Inc. v. Amazon.com*,
   998 F.3d 1373 (Fed. Cir. 2021)...........................................................................................45, 52

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*,
   802 F.3d 1283 (Fed. Cir. 2015).................................................................................................7

*Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*,
   743 F.3d 1359 (Fed. Cir. 2014)...............................................................................................27

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
   529 F.3d 1364 (Fed. Cir. 2008)...............................................................................................28

*Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*,
   15 F.4th 1136 (Fed. Cir. 2021) ..................................................................................29, 45, 51

*TVnGO Ltd. (BVI) v. LG Elecs. Inc.*,
   861 F. App'x 453 (Fed. Cir. 2021) ........................................................................................19

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997)...............................................................................................6

*Univ. of Mass., Carmel Laby's., LLC v. L'Oreal S.A.*,
   36 F.4th 1374 (Fed. Cir. 2022) ..............................................................................................13

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1317 (Fed. Cir. 2009).................................................................................21, 47, 62

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)...............................................................................................12

## STATUTES & RULES

35 U.S.C. § 282.....................................................................................................................47

35 U.S.C. §§ 282(a)-(b) ........................................................................................................27

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| A | '729 Patent Prosecution History, Decision on Appeal (BR-DAB-00001521-1526) |
| B | Valentino J. Stella & Kenneth J. Himmelstein, *Prodrugs and Site-Specific Drug Delivery*, 23(12) J. MED. CHEM. 1275 at p. 1275 (1980) (BR-DAB-00001983-990) |
| C | '729 Patent Prosecution History, December 6, 2019 Appeal Brief (BR-DAB-00001403-14) |
| D | '729 Patent Prosecution History, April 16, 2018 Office Action Response at 2, 5-11 (BR-DAB-00001293, 1296-1302) |
| E | '729 Patent Prosecution History, December 29, 2015 Office Action Response (BR-DAB-00000239-251) |
| F | '729 Patent Prosecution History, August 19, 2014 Preliminary Amendment (BR-DAB-00000041-46) |
| G | '729 Patent Prosecution History, November 7, 2017 Declaration of Ziauddin Tyebji (BR-DAB-00001097-1103) |
| H | '729 Patent Prosecution History, September 30, 2015 Non-Final Rejection (BR-DAB-00000186-199) |
| I | '729 Patent Prosecution History, March 23, 2016 Non-Final Rejection (BR-DAB-00000293-302) |
| J | '729 Patent Prosecution History, June 1, 2016 Response to Non-Final Rejection (BR-DAB-00000357-367) |
| K | '729 Patent Prosecution History, August 11, 2017 Non-Final Rejection (BR-DAB-00001071-1085) |
| L | '729 Patent Prosecution History, PTAB Reply Brief (BR-DAB-00001457-1460) |
| M | '729 Patent Prosecution History, PTAB Oral Argument Slides (BR-DAB-00001976-1982) |
| N | '729 Patent Prosecution History, January 7, 2021 PTAB Oral Argument Transcript (BR-DAB-00001529-1537) |
| O | *Distinct*, Merriam-Webster's Collegiate Dictionary (11th ed. 2012) |
| P | *Distinct*, Collins English Dictionary (2011) |
| Q | '729 Patent Prosecution History, February 28, 2019 Response to November 30, 2018 Office Action (BR-DAB-00001347-59) |
| R | '729 Patent Prosecution History, December 17, 2015 Declaration of Anilkumar Gandhi, Ph.D. (BR-DAB-00000252-255) |
| S | U.S. Patent No. 7,658,939 (*King Pharms.* Patent) |

I.    **INTRODUCTIONS AND BACKGROUND**

A.    **Plaintiffs' Introduction**

(1)    **The Parties**

This patent case involves two patents owned by Breckenridge Pharmaceutical, Inc. ("Plaintiff"), U.S. Patent Nos. 11,013,729 ("the '729 Patent") and 11,752,142 ("the '142 Patent") (collectively, the "Patents-in-Suit"). Plaintiff contends that Defendants Hetero USA, Inc., Hetero Labs Limited Unit-III, Hetero Labs Limited, and Camber Pharmaceuticals, Inc. (collectively "Defendants") infringe both Patents-in-Suit, and that the infringement is willful.

(2)    **The Patents in Suit**

The '729 Patent issued on May 25, 2021[1] and claims oral pharmaceutical compositions of dabigatran etexilate, an active ingredient that prevents harmful blood clots from forming in blood vessels. '729 Patent, 1:57-2:3. The '142 Patent issued on September 12, 2023, and it shares a common specification with the '729 Patent, but claims methods of using certain oral pharmaceutical compositions with dabigatran etexilate to treat various medical conditions associated with harmful blood clots. '142 Patent, 16:9-18:18.

(3)    **Background on Solid Oral Dosage Forms with Dabigatran Etexilate Mesylate**

Dabigatran etexilate is a prodrug,[2] and dabigatran etexilate mesylate ("DEM") is a solid salt form of dabigatran etexilate. '729 Patent, 2:9-11. DEM is stable in its solid state, but "it

---

[1] The Board of Patent Appeals issued a six-page opinion reversing the Examiner's primary rejection of the claims during prosecution of the '729 patent. The Court may find the opinion helpful as an independent and objective summary of the '729 Patent and the overall scope of its claims. *See* Ex. A: Decision on Appeal (BR-DAB-00001521-1526).

[2] A prodrug is a structurally modified compound that is designed to convert chemically in the body (in vivo) into one or more active moieties (or metabolites). *See generally* Ex. B: Valentino J. Stella & Kenneth J. Himmelstein, *Prodrugs and Site-Specific Drug Delivery*, 23(12) J. MED. CHEM. 1275 at p. 1275 (1980) (BR-DAB-00001983-990). The structural modification is typically made to

predominantly undergoes degradation by hydrolytic pathways in the presence of moisture," and it is sensitive to acid. *Id.* at 2:22-25. Upon oral administration, DEM dissolves in the acidic media of the GI tract, allowing dabigatran etexilate to enter the blood, where it is then converted into the active ingredient (dabigatran) by hydrolysis in the liver. *Id.* at 2:9-11. The aqueous solubility of DEM is also dependent upon the acidity of the media in which it is dissolved. *Id.* at 2:14-17. These properties require that pharmaceutical oral dosage forms with DEM be prepared in a manner that both allows for some acid in the formulation, but also avoids degradation of the DEM during storage. *Id.* at 2:4-15.

Prior strategies for preparing oral solid dosage forms of DEM included capsules with one type of pellets made with multiple layers of excipients that separate the DEM from acids in the pellets, which were then filled into hard capsules. *Id.* at 2:26-44. The process of preparing layered pellets was "cumbersome, time consuming and uneconomical." *Id.* at 2:43-44. Tablets were also prepared in the prior art, but the DEM in those tablets were highly susceptible to hydrolysis during storage in the presence of humidity. *Id.* at 2:45-54. These prior formulation strategies were considered unlikely to remain stable over the shelf life of the product. *Id.* at 2:55-58.

The inventors of the Patents-in-Suit took a different approach. They designed a composition with a mixture of two different types of particles: one that contains a solid form of the drug or active pharmaceutical ingredient ("API")[3] not in contact with an acid; and another type of particle with an acid not in contact with the API. *See e.g.* '729 Patent, 2:62-3:14. Each of the two different types of particles may be made with binders, diluents, or lubricants in their respective

---

address an undesirable property of the active moiety that reduces its availability, safety, or effectiveness (for example, low solubility or poor stability).

[3] As used herein, "the API" is meant to refer collectively to "dabigatran etexilate in the form of the free base or in the form of a pharmaceutically acceptable salt or polymorph thereof," as recited in the claims of the Patents-in-Suit.

2

manufacture. *Id.* at 4:38-44. Each of the different types of particles may then be (as an option) coated with a protective coating layer. *Id.* at 3:29-39. When the two types of particles are then mixed together and placed into a dosage form (such as a capsule), the composition could also (optionally) include an additional "pharmaceutically acceptable excipient," in addition to the excipients that were used to make each of the two different types of particles. *Id.* at 4:24-29.

As such, the inventors both contemplated and disclosed particle mixtures where an additional pharmaceutically acceptable excipient could be present in the particles, in a protective coating layer, and/or otherwise present outside the particles themselves, e.g., an extragranular excipient. *See e.g., id.* at 11:30-12:67 (Example 1) (describing API granules and tartaric acid pellets (both particles)). Example 1 of the specification is a dosage form, for example, with tartaric acid pellets that are made by granulating tartaric acid with three excipients into a wet mass that is "extruded, spheronized, dried and screened to give pellets." *Id.* at 11:51-58. Those pellets are then coated with a protective coating layer made of hydroxypropyl methylcellulose (HPMC) and talc "to give coated tartaric acid pellets". *Id.* at 11:30-12:19. The same example also has API granules made with multiple excipients. *Id.* at 12:24-46. The coated acid pellets and the API granules are then blended with another excipient (a lubricant) called sodium stearyl fumarate, and "filled into capsules by means of a capsule filling machine." *Id.* 12:50-67.

As the specification explains, this novel formulation approach was found to not only preserve the stability of the API during storage, but also allowed for compositions of the invention to be more easily and conveniently prepared, as compared to prior dosage forms. *Id.* at 2:58-61. This formulation design also provided for an effective in-vitro release of the active ingredient into the blood upon administration to a patient. *Id.* at 2:62-3:14; *see also id.* at 3:39-42 ("The

compositions of the present invention are stable, easy to prepare, and provide the desired in-vitro release of the active.").

After a rigorous examination by the Patent Office, including an appeal to the Board of Patent Appeals, the '729 Patent issued on May 25, 2021. Claim 1 of the '729 Patent is exemplary, and is as follows:

> The invention claimed is:
> **1**. A composition comprising: a mixture of at least two distinct types of particles wherein
>   a) the first type of particles comprise dabigatran etexilate in the form of the free base or in the form of a pharmaceutically acceptable salt or polymorph thereof, wherein the first type of particles is free from organic acids and inorganic acids; and
>   b) the second type of particles comprise at least one pharmaceutically acceptable organic acid, wherein the second type of particles is coated with a protective coating layer and is free from dabigatran etexilate.

'729 Patent, 16:9-19. The balance of the issued claims employ common terminology that is not normally subject to differing interpretations by persons of ordinary skill in the art. The '142 Patent issued on September 12, 2023, and covers methods of treatment using the claimed compositions. '142 Patent, 16:9-18:18.

**B.    Hetero's Introduction**

Both Breckenridge and Hetero pursued FDA-approval to make generic versions of the branded dabigatran product, Pradaxa (dabigatran etexilate mesylate), that was sold by Boehringer Ingelheim ("BI"). Hetero was able to secure FDA approval and started selling its generic product in 2022, but Breckenridge only obtained final approval in December 2024. And in the course of developing its generic dabigatran product, Breckenridge sought to obtain the two Asserted Patents:

the '729 Patent and the '142 Patent. Unlike BI's patent on the Pradaxa formulation, where dabigatran and the tartaric acid component coexist on the same particle, Breckenridge's Asserted Patents are directed to a two-bead formulation that separates dabigatran and tartaric acid into separate particles. The Asserted Patents then endured a prolonged and challenging examination at the Patent Office to differentiate themselves from the prior art (including BI's patent on a one-bead formulation design), ultimately yielding a narrowly tailored set of claims.

Now, in an effort to capitalize on its patents, Breckenridge stretches the limited scope of its asserted claims by disregarding intrinsic evidence and reinterpreting key terms to capture Hetero's ANDA Product. Essentially, Breckenridge urges the Court to overlook the clear language of the claims, the specification, and the clear statements Breckenridge made during prosecution to distinguish the asserted claims from the prior art. For instance, Breckenridge seeks to reinterpret "two distinct types of particles" by substituting "different" for "distinct," sidestepping the precise meaning of "distinct" it established during prosecution. Likewise, with the term "free from"—a well-recognized absolute term critical to differentiating from the prior art's single-bead formulation containing both dabigatran and tartaric acid—Breckenridge basically attempts to recast it as "essentially free from," so that the claim might tolerate the presence of some acid on the dabigatran bead and some dabigatran on the acid bead in order to try to save its infringement argument. Finally, with the "mixing" terms, Breckenridge brazenly ignores an entire component of its claimed composition, manipulating its patents' scope solely to target Hetero's ANDA Product.

## C.    Hetero's Sur-Reply Introduction

Unable to overcome the strong intrinsic support for Hetero's proposed constructions, Breckenridge resorts to exaggerated accusations that Hetero is somehow "rewriting" the claims.

5

Breckenridge's resistance to construe the disputed claim terms runs afoul of well-settled law that claim construction is an essential predicate to determining the ultimate issues in a patent case. Breckenridge seems to suggest, repeatedly, that claim construction is some taboo exercise that should be forgone. That is wrong. Claim construction is not an exercise conducted in a vacuum, but rather conducted to further narrow the substantive issues in a patent case, as here. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 996 n.7 (Fed. Cir. 1995) ("A claim must be construed before determining its validity just as it is first construed before deciding infringement"); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope . . . for use in the determination of infringement. It is not an obligatory exercise in redundancy.").

Breckenridge's continued opposition to Hetero's constructions demonstrates that there is a fundamental dispute about claim scope that the Court must adjudicate. *Medicis Pharm. Corp. v. Actavis Mid Atl. LLC*, No. 11-409-LPS-CJB, 2012 WL 2126873, at *6 (D. Del. June 12, 2012) ("Plaintiffs vehemently and repeatedly criticize the inclusion of an explicit viscosity limitation in the construction of this phrase, suggesting that the parties' dispute in this regard is truly fundamental."). Hetero discusses its accused product to provide the Court context for the present disputes, which is not improper. *See Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301, 1309 n.10 (Fed. Cir. 2006) ("[I]t is appropriate for a court to consider the accused device when determining what aspect of the claim should be construed."). While Breckenridge accuses Hetero of being "litigation driven," it is Breckenridge's claim construction positions that are litigation driven, attempting to broaden the meaning of the disputed terms to ensnare Hetero's non-infringing product.

## II.    DISPUTED CONSTRUCTIONS

The disagreements between the parties arise from five clauses that are used within several of the patent claims. The disagreements are organized herein by three categories: (1) the plain meaning of "two distinct types of particles"; (2) the plain meaning of two clauses that use the term "free from"; and (3) the plain meaning of "mixing" or "a mixture of." Each term is addressed in the order in which the underlying term appears in the claims.

### A.    "Two Distinct Types of Particles"

The term "two distinct types of particles" is employed by each independent claim of the Patents-in-Suit. *See* '729 Patent, claims 1, 11, 16 and '146 Patent, claims 1, 8, and 16. The parties' positions are as follows:

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction required.<br><br>Alternatively, "two different types of particles" | "a first type of particle that is not in contact with a second type of particle"<br><br>Alternatively, indefinite |

### (1)    Plaintiff's Opening Position

Plaintiff does not believe this term requires construction. The claim language is not ambiguous – the qualitative content of each type of particle is described in the balance of the claim, and they are quite clearly distinct from each other. *See Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) ("Because the plain and ordinary meaning of the disputed claim language is clear, the district court did not err by declining to construe the claim term."). Should the Court disagree, its plain meaning should simply be "two different types of particles." This is consistent with the patent's disclosure, and the claims that were issued by the Patent Office.

In contrast, Defendants seek to write a spatial separation limitation into the claims, which is not found anywhere in the intrinsic record. No claim or any part of the intrinsic record supports revising these claims to require "a first type of particle that is not in contact with a second type of particle." Indeed, there are several other claims, all of which carry (by dependence or otherwise) the "two distinct types of particles" limitation. *See* '729 Patent, claims 8-9 and 16-18. These claims require a mixture (or blending) of the "first" and "second" types of particles, which are then placed into a hard capsule. *Id.* It defies common sense to argue that each of the distinct types of particles, when combined and placed into a capsule, could possibly be required to be "not in contact" with each other.

### a.    *The Claims*

It is black letter law that the analytical focus of any claim construction analysis must "begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point out and distinctly claim the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, P 2); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*). There is also a heavy presumption that claim terms carry their ordinary and customary meaning, as understood by a POSA.[4] *See Aventis Pharms. Inc. v. Amino Chems. Ltd.,* 715 F.3d 1363, 1373 (Fed. Cir. 2013) ("There is a heavy presumption that claim terms are to be given their ordinary and customary meaning.").

The plain words used in every claim in which the term "two distinct types of particles" appears in both Patents-in-Suit explicitly confirm that the two types of particles recited in the body

---

[4] In this case, a POSA at the relevant time (February 21, 2012) would have had a Master's or Doctoral degree in pharmaceutics, pharmacology, and/or pharmaceutical formulations, with at least four years of practice experience working in the area of pharmaceutical formulation development.

of the claim are distinct with respect to the other. For example, subpart "a)" of claim 1 of the '729 Patent defines the "first type of particles" as particles containing the API "free from"[5] organic or inorganic acids. '729 Patent at 16:11-15. Subpart "b)" of the same claim then defines the "second type of particles" as particles that contain at least one acceptable organic acid "free from" the API. *Id.* at 16:16-19. No claim language, however, suggests that the types of particles may not be in physical contact with the other.

Moreover, there are process claims that depend from claim 1 that explicitly recite one means for preparing a composition of claim 1 that involves preparing two distinct types of particles. *See* '729 Patent, claim 8. For example, the first two steps of claim 8 (steps i through ii) involve preparing granules[6] with API that does not include acid. *Id.* The next three steps (steps iii through v) involve preparing coated granules with acid and no API. *Id.* The API and the coated acid granules are then blended together "to form a mixture of at least two types of granules," followed by the optional addition of another excipient to the blend. *Id.*, steps vi and vii. A lubricant is then also added to the blend, followed by "filling the lubricated mixture . . . into suitable hard capsules." *Id.* at steps viii and ix.

In sum, the claims explicitly establish that each of the "types of particles" are distinct. The claims also contradict Defendants' importation of a spatial distance limitation into the meaning of "two distinct types of particles." Plaintiff is unaware of any basis in the balance of the intrinsic record that supports the notion that the first type of particle "is not in contact with" a second type of particle. Indeed, other dependent claims require that each type of particle be mixed and/or

---

[5] The construction of this term (if necessary) is addressed later in this brief.
[6] A granule is a type of "particle," as that term is defined in the specification. '729 Patent, 8:63-9:1.

blended together and then placed inside a hard capsule. Both types of particles cannot be both "not in contact with" and also blended or mixed together and placed into a capsule.

Should construction be necessary, Plaintiff respectfully submits that "two distinct types of particles" means "two different types of particles." Defendants' construction makes no sense.

### (2)    Hetero's Answering Position

The dispute for this term boils down to whether Breckenridge can rewrite and expand its asserted claims to capture Hetero's product, which comprises dabigatran particles in contact with tartaric acid particles. Although reference to the accused product is not appropriate for construing a claim term, "it is appropriate for a court to consider the accused device when determining what aspect of the claim should be construed." *Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301, 1309 n.10 (Fed. Cir. 2006).

As explained below, Breckenridge's proposed construction contradicts the statements it made to the Patent Office describing its claims, and is otherwise unsupported by the intrinsic evidence. On the other hand, and as explained more below, the intrinsic evidence supports Hetero's construction of "two distinct particles" as meaning "a first type of particle that is not in contact with a second type of particle."

The Court should adopt Hetero's proposed construction.

### a.    Breckenridge's construction is unsupported by the intrinsic evidence.

Breckenridge raises two primary arguments in support of its proposed construction. Both fail. *First,* Breckenridge claims that the word "distinct" refers to "the qualitative content of each type of particle," i.e., that the dabigatran particle is free from acid, and that the acid particle is free from dabigatran. *See* Pl.'s Opening Br. at 7. But this argument is illogical and lacks support in the intrinsic evidence. The remainder of the claim language already describes "the qualitative content

of each type of particle." For example, claim 1 of the '729 Patent defines the two types of particles identified in subparts a) and b) as qualitatively different. The first type of particle does not contain acid, which is required in the second type of particle. Likewise, the second type of particle does not contain dabigatran, which is required in the first type of particle. Consequently, the difference in "the qualitative content of each type of particle" is already provided by the claim itself, not by the "distinct" term. Breckenridge's proposed construction therefore renders "distinct" superfluous—one of the hallmarks of a defective claim construction argument. *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) (Courts "must give meaning to all the words in [patent] claims.") (*citing In re Sabatino*, 480 F.2d 911, 913 (CCPA 1973)).

Additionally, the claim language that the dabigatran particle is free from acid, and that the acid particle is free from dabigatran was added over two years *after* the "distinct" limitation. *Compare* Ex. E at 10 (adding "distinct" to claim language) *with* Ex. D at 2 (adding "free from" limitation to claim language). And, the "distinct" limitation and "free from" limitations were added in response to entirely different arguments by the Examiner. *Compare* Ex. E at 4 (explaining reasoning for adding "distinct" to claim language) *with* Ex. D at 6–8 (explaining reasoning for adding "free from" limitation to claim language). Accordingly, there is nothing in the intrinsic evidence linking the language that the dabigatran particle is free from acid, and that the acid particle is free from dabigatran, to the "distinct" limitation.

*Second,* Breckenridge argues that process claims that depend from claim 1 contradict Hetero's construction because the two types of particles would have to be in contact with one another to be mixed together. *See* Pl.'s Opening Br. at 9–10 ("Both types of particles cannot be both "not in contact with" and also blended or mixed together and placed into a capsule."). In particular, Breckenridge argues that claim 8 of the '729 Patent describes the "optional addition of

another excipient to the blend [of two types of granules]" that might otherwise keep the acid and dabigatran particles separate, and therefore claim 8 must mean that the acid and dabigatran particles can be in contact with one another. *Id*. But Breckenridge completely misreads claim 8— *only* step vii is optional. Claim 8's step vii) recites, "optionally blending the mixture of at least two types of granules of step (vi) with at least one pharmaceutically acceptable excipient." But claim 8 also recites the non-optional step viii of "adding a lubricant to the blend of step (vii)." Thus, dependent process claims like claim 8 do not establish that Hetero's construction is wrong because the lubricant ensures the two types of particles are not in contact.

### b.    The intrinsic evidence supports Hetero's construction.

### i.    The specification supports Hetero's construction.

A claim term is read "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1312–13 . *See also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (the specification is "the single best guide to the meaning of a disputed term"). Here, the common specification of the '729 and '142 patents supports Hetero's proposed construction that "two distinct particles" means "a first type of particle that is not in contact with a second type of particle."

The specification explains that "the presence of an organic acid in close contact with the active [i.e., dabigatran]" in a composition made "without any special steps taken to separate the two from each other, can make the active highly susceptible to hydrolysis in the presence of humidity." '729 Patent 2:50–54. The examples illustrate that Breckenridge's purported "special step" to separate the two types of particles so they are not in contact was mixing the two types of particles with a lubricant (a type of pharmaceutically acceptable excipient). In Example 1 of the specification, the two types of particles were mixed together and "[were] lubricated with sodium

12

stearyl fumarate and filled into capsules by means of a capsule filling machine." *Id.* 12:61–67. The same step is taken in Examples 2 and 3. *See id.* 14:21–27 (Example 2); 15:37–40 (Example 3). Given that each of the examples in the common specification supports Hetero's construction, it is no wonder that Breckenridge failed to even cite to the specification in support of construction, let alone point to any portion of the specification that discloses a mixture of *only* two types of particles without any excipient to keep them separated.

Accordingly, the specification is clear that that the "two distinct particles" claim language means "a first type of particle that is not in contact with a second type of particle."

### ii.   During prosecution, Breckenridge repeatedly and consistently described the particles of acid and particles of dabigatran to not be in contact.

"Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. "The prosecution history, in particular, 'may be critical in interpreting disputed claims,'" and "even where 'prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction.'" *Univ. of Mass., Carmel Laby's., LLC v. L'Oreal S.A.*, 36 F.4th 1374, 1379 (Fed. Cir. 2022) (citations omitted). Here, the prosecution history overwhelmingly supports Hetero's proposed construction.

Prior to any rejection by the patent examiner, claim 1 of the U.S. Pat. App. 14/379,613 (which later issued as the '729 patent) recited in part, "A composition comprising a mixture of at least two types of particles . . . ." Ex. F at 3. The pending claims were rejected by the patent examiner as anticipated by BI's Pradaxa patent application, US Pat. App. 2006/183779 ("US '779"), which disclosed a dabigatran composition comprising a multi-layered particle of an acid core surrounded by a protective coating layer, all surrounded by a dabigatran layer. *See* Ex. H at 7–8. *See also* '729 Patent, 2:30–44 (discussing US '779 as part of the background of the invention). A visual depiction of the dabigatran composition described by US '779 is below:









Ex. M at BR-DAB-00001977. According to the patent examiner, US '779 disclosed "more than two particles" used in a capsule, "and the instant claims do not make the distinction between the two types of particles being different." Ex. H at 7–8. In response, Breckenridge added the phrase "distinct" to the pending claims response. *See* Ex. E at 4.

But the patent examiner continued to reject the pending claims in view of US '779. *See* Ex. I at 4–5. In response, Breckenridge argued that its claimed composition does not "function in the same way" as the US '779 composition. As described by Breckenridge (and as illustrated in the diagram of the US '779 below), an acidic microclimate forms in the dabigatran layer of the composition in US '779 as the acid dissolves in the body after administration. Ex. J at 5. This acidic microclimate "facilitates the dissolution of the active substance." *Id*.



Ex. G at 2. By contrast, Breckenridge argued, "the instant [claimed] formulations comprise *two distinct types of particles* . . . they are *physically separated when the dosage form is taken* and both *dissolve at the same time*." Ex. J at 8 (emphasis added). Additionally, Breckenridge argued that "there is no teaching or suggestion in the '779 publication that such characteristics could be provided by a dosage form wherein the active ingredient and organic acid are *physically separated* into *two distinct particles*." *See id.* at 6 (emphasis added). Thus, Breckenridge explicitly described its claims as being different from US '779 on the grounds that dabigatran and acid were physically separated on different particles and therefore not in contact.

The patent examiner, however, maintained the rejection. Ex. K at 9–10. In response, Breckenridge again argued that, in contrast to the dabigatran compositions in US '779 which required the formation of an acidic microclimate to function, "the acidic microclimate . . . cannot be formed at all" in the compositions claimed by Breckenridge because the dabigatran is not in contact with the acid *or* the protective coating layer around the acid. Ex. G at 4. Breckenridge even

went so far as to submit a visual depiction of its claimed compositions, showing that the acid particles are not in contact with the dabigatran particles:



Ex. G at 4. Accordingly, Breckenridge sought to persuade the patent examiner that dabigatran and acid particles in the claimed compositions were not in contact, and it was this feature that distinguished the claimed composition from the US '779 composition.

Breckenridge eventually appealed the patent examiner's rejections within the Patent Office. There, Breckenridge reiterated that the dabigatran and acid particles were not in contact with each other. Indeed, Breckenridge argued that "[s]eparation into two particles would not, and could not, guarantee the important immediate diffusion . . . achieved by a single particle" like the

16

compositions of the US '779. *See* Ex. L at 2. Indeed, at the oral argument for its appeal, Breckenridge presented the below visual representation to illustrate its description of the claims:





Ex. M at BR-DAB-0001982. In describing its claims during the Patent Office appeal, Breckenridge argued that the above illustration was its "plain composition" with "separate particles" that were not in "close contact." Ex. N at 5. And, Breckenridge again argued that close contact between the acid and dabigatran was "very critical" to the US '779 compositions because it allowed an "acidic microclimate" to form within the US '779 structure, which allowed for "immediate diffusion" once the composition was in the stomach. *Id.* at 4. Moreover, Breckenridge argued that its composition *could not* provide such an acid microclimate like the US '779 compositions because of the separation between the two types of particles. *Id.* at 4–5 (Q: "Why wouldn't one of skill in the art expect the same [] acidic microclimate to be formed if you split the organic acid into a separate

17

particle from the API as the examiner has done in this combination?" A: "Well, it certainly wouldn't be -- is there a microclimate? They're separated.").

Breckenridge also argued that its claimed composition did not have the "contiguous" structure of the US '779 composition. Breckenridge characterized this contiguous structure as "critical" to the US '779 composition. *Id.* at 6. By contrast, Breckenridge argued that it had been "successful with regard to having separated" the particles to create an allegedly new composition with the same bioavailability *without* the immediate diffusion properties provided by the contiguous US '779 structure. *Id.* at 9. Breckenridge's remarks distinguishing the "contiguous" structure of the '779 structure and the "close contact" between dabigatran and acid, confirm that in the claimed compositions the dabigatran particles are not in contact with, and are not contiguous with, the acid particles.

In sum, Breckenridge's repeated and clear statements where it described its claims as covering compositions where the dabigatran and acid were physically separated on different particles, and distinguished its claims from the prior art US '779 on that basis, are highly informative and binding on the scope of the claims. *See Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1325 (Fed. Cir. 2015) ("[T]he interested public has the right to rely on the inventor's statements made during prosecution, without attempting to decipher whether the examiner relied on them, or how much weight they were given.").

### c. Alternatively, "two distinct types of particles" renders the claims indefinite.

#### i. "Two distinct types of particles" is indefinite if it is not construed according to Hetero's proposed construction.

Should the Court decline to adopt Hetero's construction of "two distinct types of particles," the claim would be rendered indefinite. As discussed above, the specification only discloses embodiments where the two types of particles are not in contact. *See supra* § II(A)(2)(b)(i).

Further, Breckenridge made numerous clear statements during prosecution distinguishing prior art formulations where dabigatran was in contact with the acid particle. *See supra* § II(A)(2)(b)(ii).

If not Hetero's proposed construction, a person of ordinary skill in the art would not be reasonably certain as to the claim scope. For example, Merriam-Webster provides numerous definitions of the word "distinct": "distinguishable to the eye or mind as being discrete," "physically separate," or "readily and unmistakably apprehended." Ex. O at 3. Similarly, Collins English Dictionary defines "distinct" as "not the same; different." Ex. P at 3. A person of ordinary skill would not understand which meaning to give to the term. *See TVnGO Ltd. (BVI) v. LG Elecs. Inc.*, 861 F. App'x 453, 458–59 (Fed. Cir. 2021) ("Even if it may be possible to 'ascribe some meaning' to the disputed limitation . . . more is required: a [POSA] must have reasonable certainty."). For example, if "distinct" meant "distinguishable to the eye or mind as being discrete," that would not provide any certainty as to the scope of the claims because what is distinguishable to the eye or mind is a subjective assessment. Similarly, if "distinct" meant "readily and unmistakably apprehended," that should still not provide any clarity as there is no guidance as to how or to whom the two particles are to be readily and unmistakably apprehended. Last, if "distinct" meant "not the same" or "different," then that would render the "distinct" term meaningless in the claims because the remainder of the claim language already describes how the two types of particles are not the same. So, this meaning would again provide no clarity. Because only Hetero's proposed construction provides a meaning to the word "distinct," which is also in line with the definition of "distinct" as "physically separate," if it were not adopted by the Court, the claims are indefinite.

ii.    **"Two distinct types of particles" is indefinite if it is construed according to Breckenridge's proposed construction.**

Breckenridge claims that the word "distinct" means "different." *See* Pl.'s Opening Br. at 7. Not only is this argument illogical and lacking in support in the intrinsic evidence, but it renders the claim indefinite.

The remainder of the claim language already describes how the two types of particles are different. As described above (pp. 10–11), the remainder of the claims already inform how the two types of particles are different: 1) the first type of particle contains dabigatran and no acid, and 2) the second type of particle contains acid and no dabigatran. Thus, the qualitative difference between the particles is provided elsewhere by the claim language, not by the "distinct" term. Breckenridge fails to provide for any other basis by which the two types of particles should be different. Nor do the Asserted Patents provide any criteria on how the two types of particles should be "different" nor do the Asserted Patents provide any information on how to assess the difference between the particles. Consequently, Breckenridge's construction fails to provide reasonable certainty as to the scope of the claims, and therefore renders them indefinite.

**(3)    Plaintiff's Reply**

Breckenridge has no interest in rewriting the plain language of its patent claims for purposes of this suit. The Patent Office thoroughly examined the patents-in-suit and issued them as written. The claim terms need not be revised by this Court to establish Hetero's infringement. As set forth in its Opening Brief, Breckenridge contends that the term "two distinct types of particles" does not require construction. This term simply signifies that the subjects of the claim sentence (the particles) are distinct (or different) from each other – nothing more. Breckenridge has only proposed "different" as a construction of "distinct," in the event the Court deems any construction is necessary.

In contrast, Hetero seeks to dramatically alter the scope of the patents-in-suit by introducing from whole cloth a new claim limitation, one that serves its present litigation needs. Hetero alleged that the particles it uses in its formulation are "in contact" with each other, since both types of particles are placed into a capsule together. *See* Dfs.' Answering Br. at 10. Consequently, Hetero asks the Court to write-in a limitation that requires those particles to be "not in contact with" each other. *Id.* at 10. By doing so, Hetero reveals its true objective: writing into the claims a limitation for purposes of a non-infringement argument.

Hetero's objective explicitly contravenes one central rule of claim construction, which is that disputed terms must be defined "without the objective of capturing or excluding the accused device." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1324 (Fed. Cir. 2009). Hetero's construction, which seeks to redefine the issued claims to argue non-infringement, should be rejected.

### a.  Hetero's Summary of the Use of a Lubricant in the Patents is Unsupported

Hetero's intrinsic record summary begins with a creative (but unsupported) interpretation of claim 8 of the '729 patent. Dfs.' Answering Br. at 10-13. Hetero suggests that the optional step of adding an additional excipient to the blend of particles before "adding a lubricant to the blend of step (vii)" establishes the curious conclusion that "the lubricant ensures the two types of particles are not in contact." *Id.* at 12. Hetero extends this argument by suggesting that the "special steps taken to separate" the two particles of the claim, a step implemented in Examples 1, 2 and 3, was to lubricate the blend of particles as they are placed into a capsule. *Id.* In Hetero's view, the lubricant is what keeps the two types of particles in the capsule "not in contact with" one another. *Id.* at 12-13.

There is no support for the assertion that the function of the lubricant used in claim 8 (and others) or its use in the examples is to ensure that the particles in the capsule are not in contact with each other. Indeed, nothing in the common specification or claims of either patent suggests that the inventors believed that the lubricant used in any of the examples exists to prevent contact between the two particles of the composition. Hetero's lubricant theory is completely unsupported by the intrinsic record.

The specification advises generally that lubricants are "substances used in solid dosage formulations to reduce friction during compression of the solid dosage [form]." '729 patent at 8:33-35. And, in Examples 1-3, sodium stearyl fumarate is used as a lubricant, added to the composition when the blended particles are "filled into capsules by means of a capsule filling machine." *Id.* at 12:65-67, 14:25-27, 15:37-40. The specification says nothing about using a lubricant to ensure that "the two types of particles are not in contact" in the dosage form. Dfs.' Answering Br. at 12-13.

Hetero also selectively misquotes the specification's reference to "special steps taken to separate the two [particles] from each other." Dfs.' Answering Br. at 12-13 (citing '729 Patent at 2:50-54). Hetero snips this phrase from a sentence that distinguishes the disclosed inventions from the prior art, which combined the acids and API into a single tablet. '729 Patent at 2:45-54. In truth, the inventive "special steps taken to separate" acid from API is explained in the paragraphs following the quoted sentence, which is to prepare "a mixture of at least two types of particles and optionally at least one pharmaceutically acceptable excipient, . . . ." '729 Patent at 2:62-65. There is no suggestion in the specification, or the claims, that the "special steps taken" involve keeping the two types of particles from contacting each other in the capsule by means of a lubricant which may (or may not) be added to the mixture of particles before loading them into a capsule. Ascribing

22

a separating function to the lubricant used in the examples is a fiction created by Hetero alone, with no support in the intrinsic record.

> **b.** **Distinguishing a Two Particle Design from the Prior Art Single Particle Design During Prosecution Did Not Disavow Claim Scope**

Hetero's arguments regarding the prosecution history are both wrong and unsupported. Hetero argues the inventors secured the '729 Patent on the basis that their invention involved ensuring that the two distinct particles never contact each other. Dfs.' Answering Br. at 13-16. This is a misreading of the file wrapper.

The heart of the innovation that led to the patents-in-suit was to (unlike the prior art) prepare distinct particles, one comprising an organic acid, the other comprising API. Ex. A (Decision on Appeal) at 2-3 (BR-DAB-00001522-23). The claims were ultimately allowed without any disavowal of claim scope, contrary to what Hetero suggests. An independent, accurate, and concise summary of the file wrapper can be found in the Decision by the Board of Patent Appeals, which explains the arguments made during prosecution that reversed the examiner's rejections, ultimately leading to the allowance of the claims of the '729 patent. Ex. A.

In brief, the examiner had taken the position that US '779 ("Brauns"), among other references, supported rejection of the claims under review. Ex. A (Decision on Appeal) at 3. US '779 disclosed a formulation design employing a single type of layered pellet with "an organic acid core surrounded by 'a separating layer followed by a layer containing the active substance.'" *Id.* at 4 (quoting US '779). The applicant ultimately demonstrated that its multi-particle design was not like the prior art, since the API and acid are "physically separated into two distinct particles," rather than being segregated by layering within one type of pellet. *See, e.g.*, Ex. K at 8; Ex. C at 4, 8; Ex. Q at BR-DAB-00001354-56. The applicant never qualified this central argument, as Hetero

now infers, to state that the two distinct particles must *never* be in contact with each other once they are blended and filled into a capsule.

### c.    Hetero's Representations of the Prosecution History are Misleading

Hetero also inaccurately describes various visual representations provided by the applicant during prosecution to explain the compositions under review. However, when properly considered, the visual representations do not provide any support for Hetero's theory.

One of the diagrams submitted during prosecution illustrates the claimed particles "at the absorption site," after the capsule has dissolved in the body. *See* Dfs.' Answering Br. at 15-16 (citing Ex. G at 4, BR-DAB-1100). The diagram, complete with the paragraph introducing its purpose to the examiner, is as follows:



The formulation of the present application would not have been expected to result in a good bioavailability because the acidic microclimate needed for the transportation of dabigatran and absorption through the gastric mucosa cannot be formed at all, as evidenced by the picture shown below representing the formulation of the present invention at the absorption site:

In spite of that, the formulation of the present invention ***unexpectedly shows the desired bioavailability***.

24

Ex. G at 4. As can be seen, this diagram was not represented to be a depiction of the composition – it illustrates what happens to the particles after the capsule is administered, and before they dissolve in the body for absorption through the gastric mucosa. In its Answering Brief, Hetero incorrectly represents to the Court that this diagram was presented by the applicant as "a visual depiction of [Breckenridge's] *claimed compositions,* showing that the acid particles are not in contact with the dabigatran particles." Dfs.' Answering Br. at 15-16 (*emphasis* added). Hetero's representation that this figure depicts particles not in contact with each other "in the claimed compositions" is simply wrong.

Much later in the prosecution, during its appeal to the Patent Board, the applicant also contrasted the "single particle" design of U.S. '779 with an illustration of the claims under review, as follows:



Ex. M at 2, 7. On the left, the applicant illustrated the prior art design – a single particle with a core of acid, an insulating layer that separates the acid from the API, a layer of API, and an optional coating. *Id.* at 2. On the right, the applicant provided a contrasting illustration (not drawn to scale) of two different types of particles in a capsule – one containing organic acid coated with a protective layer (blue circles), and another containing API (red circles). *Id.* at 7. The applicant did

not argue, as Hetero contends, that the prior art contains "formulations where dabigatran was in contact with the acid particle." Dfs.' Answering Br. at 19. The illustration on the left plainly shows that the prior art segregated dabigatran from the acid using an "insulating layer" surrounding an acid core, which keeps the acid in the core from contacting dabigatran in the active substance layer in the prior art formulation design.

A transcript of the oral argument describing these diagrams before the Patent Board is included in the file wrapper. *See* Ex. N (BR-DAB-00001529-37). During that argument, counsel for the applicant, referring to the illustration on the right, was emphasizing the differences in formulation design, and said that "[t]he particles in there you see that's not layered, they're separate particles, they're not immediate in close contact." *Id.* at 5:5-7 (BR-DAB-00001533). In response, one of the Judges on the panel observed that the diagram was not drawn to scale, stating "I'm not sure that there would be this sort of floating in the air in an actual capsule." *Id.* at 5:11-12. This exchange involved distinguishing the claimed composition (a two particle design) from the prior art (a single layered pellet design). This exchange is far from a clear and unmistakable disavowal of claim scope, and it does not even hint that the applicants meant to claim a formulation design where different particles in a capsule can never contact each other. *See Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the **full scope** of its claim language.") (**emphasis** added).

In summary, Hetero has presented the Court with an incorrect summary of the extensive examination of the '729 Patent by the Patent Office. The record does not support Hetero's theory that the claims should be read to capture a composition unlike that which was claimed, examined, and approved by the Patent Office. Hetero's construction is therefore plainly incorrect. It is solely

designed to manufacture a defense to literal infringement, where none otherwise exits. Hetero's construction should, accordingly, be rejected.

### d.  The Intrinsic Record Provides Ample Information Defining the Scope of the Claimed Inventions

Hetero's alternative indefiniteness arguments are entirely speculative and unsupported by any evidence. Indefiniteness requires proof, by clear and convincing evidence, that a POSA, viewing the claim in light of the patent specification and prosecution history, would not be sufficiently informed about the scope of the invention with reasonable certainty. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014); *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1366 (Fed. Cir. 2014); 35 U.S.C. §§ 282(a)-(b). Hetero presents only conclusory alternative "if then" rhetoric, supported by a collection of dictionary references quibbling with semantic examples of how the word "distinct" is defined in different contexts, none of which a formulation scientist would struggle with when reviewing the patents-in-suit. As the *Nautilus* Court advised, "patents are 'not addressed to lawyers, or even to the public generally,' but rather to those skilled in the relevant art." *Nautilus*, 572 U.S. at 909 (quoting *Carnegie Steel Co. v. Cambria Iron Co.,* 185 U.S. 403, 437 (1902)). There is no evidence before this Court suggesting a POSA would not readily understand the invention was to prepare two distinct, or different, types of particles, as is clearly and unambiguously claimed.

### e.  Hetero's Indefiniteness Arguments Are For Another Day

Regardless, courts in this District have frequently deferred indefiniteness challenges from the claim construction stage until the merits phase. *See, e.g.*, *Datacore Software Corp. v. Scale Computing, Inc.*, C.A. No. 22-535-GWB, 2023 WL 5207928 at *17-18 (D. Del. Aug. 14, 2023) (finding Court would benefit from more robust evidentiary record and deferring ruling on alleged indefiniteness until the case dispositive motion stage). Hetero clearly has not met its burden of

proof on this record. However, deferring a ruling on indefiniteness would also be well within the Court's discretion, and consistent with the Federal Circuit's directive that courts "be cautious not to allow claim construction to morph into a mini-trial on validity." *See Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014).

### (4) Hetero's Sur-Reply

Hetero established that this term means "**a first type of particle that is not in contact with a second type of particle**." Breckenridge's proposal is effectively a non-construction, as it merely swaps out the word "distinct" for "different." Not only is this unhelpful in understanding the claim scope, it finds no support in the intrinsic evidence. The prosecution history is clear and supports Hetero's construction. Breckenridge repeatedly described its "two distinct particles" as "physically separate" and "not in close contact."

Confronted with these facts, Breckenridge points to isolated specification language describing the claimed formulation as "a mixture of at least two types of particles and optionally at least one pharmaceutically acceptable excipient." But this statement does not address the specific question about the particles being distinct. Breckenridge's patent claims were repeatedly rejected over US '779 and, as a consequence, narrowed by adding the word "distinct" to its claims in order to obtain allowance. Breckenridge cannot now rely on unclaimed disclosures in its original patent application that are apart from the claims at issue in this case. *See TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("Indeed, read in the context of the specification, the claims of the patent need not encompass all disclosed embodiments. Our precedent is replete with examples of subject matter that is included in the specification, but is not claimed.").

### a. Breckenridge's prosecution admissions confirm that dabigatran and acid particles are physically separate.

Breckenridge made clear and unambiguous statements during prosecution that fully support Hetero's construction, which are binding on Breckenridge. *See Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1141 (Fed. Cir. 2021) ("The doctrine [of prosecution disclaimer] ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers."). This is how Breckenridge described the claimed composition to the examiner to overcome a rejection based on a US '779 reference: "<u>there is no teaching or suggestion in the '779 publication that such characteristics could be provided by a dosage form wherein the active ingredient and organic acid are *physically separated* into two *distinct* particles</u>." Ex. J at 6. Not only did Breckenridge argue being "physically separated" as key to patentability, but Breckenridge also expressly linked that feature to the notion of being "distinct." Breckenridge could have argued that the key to patentability was being "different," as it tells this Court now, but that is not what Breckenridge did.

Desperate to escape these fatal statements, Breckenridge accuses Hetero of "misleadingly" presenting the prosecution history, including Breckenridge's own diagram reproduced below:



This diagram speaks for itself. There is nothing misleading about Hetero's description: "a visual depiction [-it is-] of the claimed compositions [-it is-], showing that the acid particles are not in contact with the dabigatran particles [-it does-]." Indeed, Breckenridge described this diagram to the examiner as "[t]he formulation of the present invention." Ex. G at 4. *See also* '729 9:23–25 ("The term 'composition' or 'formulation' has been employed interchangeably for the purpose of the present invention.").

Breckenridge's new argument—that the diagram is irrelevant because it pertains only to what happens after the claimed composition is ingested—is unavailing. Breckenridge describing the particles in its composition as "two distinct types of particles . . . they are *physically separated when the dosage form is taken*" confirms Hetero's construction. *See* Ex. J at 8. Even if the Court assumes *arguendo* that Breckenridge is correct about this diagram, that still does not negate Breckenridge's other statements linking "physically separate" with "distinct."

Breckenridge also tries to downplay its statements to the Patent Appeals Board that its compositions are "separate particles" not in "close contact." But it is inconceivable how Breckenridge can argue such with a straight face, given that this notion of "physically separate" and not in "close contact" was their consistent theme throughout prosecution in order to get these patents issued. Answering Br. at 19–24. Breckenridge's Reply reproduces an image of its claimed composition from the prosecution history that decisively supports Hetero's construction:



And here is how Breckenridge described this image: "the applicant provided a contrasting illustration (not drawn to scale) of *two different types* of particles in a capsule – one containing organic acid coated with a protective layer (blue circles), and another containing API (red circles)." As can be seen, the particles are "physically separated" and not in contact with one another.

Finally, Breckenridge creates a strawman by asserting that Hetero's construction requires the two particle types to "never be in contact." But, whether the two particles always remain

physically separate and/or under what conditions they may touch are infringement questions that are not ripe for adjudication in this claim construction proceeding.

> **b.    The claim language further belies Breckenridge's purported "construction"**

Breckenridge creates another strawman, arguing that claim 8 of the '729 patent does not support Hetero's construction. It was Breckenridge—not Hetero—that first raised claim 8 in support of its constructions. Opening Br. at 9. Regardless, Hetero rebutted Breckenridge's arguments as to claim 8 and showed that it is not inconsistent with Hetero's construction. Answering Br. at 11–12.

Breckenridge mischaracterizes Hetero's construction to mean that there must always be a lubricant, as opposed to any other suitable excipient, between the claimed particles to keep them separate. That is wrong. Claim 8 expressly recites a lubricant. But other claims do not, meaning the "physical separateness" can be achieved by other means. This in no way negates Hetero's construction, which is simply that the two types of particles remain physically separate and not in contact. Hetero in no way suggests that a lubricant must *always* be present to achieve separateness. The lubricant recited in claim 8 represents one embodiment for keeping the two types of particles "physically separate," as required by all claims. But Breckenridge broadly drafted the other claims to simply require "physical separation," without specifying any particular means for doing so. Finally, Breckenridge quibbles that the lubricant's function is to "reduce friction." But that is precisely the point. Friction is reduced by preventing two objects from touching and rubbing against one another.

> **c.    Indefiniteness is ripe for decision.**

Breckenridge argues that there is no evidence suggesting a POSA would not readily understand the term "distinct." But Breckenridge fails to provide any evidence that its "distinct"

construction adds non-redundant meaning to the claims or that "two distinct particles" has a general meaning in the art. Nor does Breckenridge challenge the differing dictionary definitions offered by Hetero. Consequently, Hetero's indefiniteness arguments stand largely unchallenged, and can be adjudicated now instead of later in the case.

### B.    The "Free From" Terms

The term "free from" is used in two separate clauses of each independent claim of the Patents-in-Suit. *See* '729 Patent, claims 1, 11, 16; and '142 Patent, claims 1, 8, and 16. The parties' positions are as follows:

### (1)    Plaintiff's Opening Position

The term "free from" does not require construction. The intrinsic record is clear that "free from" is a term meant to describe the content of each respective type of particle in the claimed composition in a general, qualitative sense. There is no good reason for revising the issued claim language in a manner that categorically excludes "any amount of" the acids and/or API from either type of particle. Such an absolute, quantitative limitation was not chosen by the inventors to claim their inventive compositions, nor examined by the Patent Office. And, as a general matter, "[c]ourts do not rewrite claims; instead [they] give effect to the terms chosen by the patentee." *K-2 Corp v. Salomon S.A.,* 191 F.3d 1356, 1364 (Fed. Cir. 1999); s*ee also Smartmetric, Inc. v. Am. Express Co.,* 476 Fed. Appx. 742, 744-745 (Fed. Cir. 2012) (same).

Should the Court disagree, and find that construction is necessary, Plaintiff submits that the "free from" terms should not be as narrowly defined as Defendants propose. The specification discloses compositions that separate the API from the acids by segregating each into two distinct types of particles, which was unlike the formulation designs of the prior art. The absence of contact between the API and the acids contained in each respective type of particle is what avoids

hydrolysis of the DEM in storage. The intrinsic record does not support the notion advanced by Defendants that one particle "does not contain any amount of" the acids or API of the other type of particle. Accordingly, Plaintiff's construction should be adopted.

### a. "the first type of particles is free from"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No Construction Required.<br><br>Alternatively, "the first type of particles does not contain organic acids and inorganic acids in contact with the dabigatran etexilate" | "the first type of particles does not contain any amount of organic acids and inorganic acids" |

As can be seen, assuming construction is deemed necessary, both parties propose meanings that share a common theme, which is that the term "free from" describes that which is not contained within the two distinct types of particles in the claimed compositions. The disagreement lies in whether the POSA would understand "free from" to also require an absolute quantitative limitation mandating that each type of particle "does not contain *any amount of*" the excluded component of each respective type of particle. Plaintiff contends that the term was intended to capture a formulation design in which the acids and/or API contained in each particle type are not in contact, as that is the feature which preserves stability of the compositions.

### i. The Claims

Claim 1 of the '729 Patent is representative, and its plain language describes "the first type of particles" as particles that "comprise [the API], wherein the first type of particles is *free from* organic acids and inorganic acids." '729 Patent, claim 1 a). No other claim in the Patents-in-Suit suggests that the term "free from" means the particle "does not contain any amount" of the recited acids or inorganic acids.

34

ii.      **The Specification**

The common specification of both Patents-in-Suit discloses various embodiments of the

inventive compositions. The specification begins by noting the compositions were developed

"after rigorous experimentation." '729 Patent, 2:62-3:2. The disclosure then broadly describes the

invention as oral compositions of dabigatran etexilate which comprise "a mixture of at least two

types of particles," one with "an active agent," and the other with "at least one pharmaceutically

acceptable organic acid." *Id.*

The compositions are described as "chemically and polymorphically stable," and can be

prepared by a "simple, non-tedious and cost-effective process." *Id.* at 3:3-6. Some embodiments

broadly describe the mixture of the two types of particles, without using the term "free from." *Id.*

at 4:24-39. And, in one embodiment, a composition described as "a most preferred embodiment,"

the specification states, as follows:

> In a most preferred embodiment of the present invention
> the first type of particles comprising dabigatran etexilate is
> 65   free from acids and the second type of particles comprising
> at least one pharmaceutically acceptable organic acid is free
> from dabigatran etexilate.

*Id.* at 4:63-68. Nowhere in the specification do the inventors limit any aspect of the inventive

compositions to a "first type of particles" that "does not contain *any amount of*" the acids disclosed.

The specification does, however, advise that "the presence of an organic acid in close

contact with the active" in a composition made "without any special steps taken to separate the

two from each other, can make the active highly susceptible to hydrolysis in the presence of

humidity." *Id.* at 2:50-54. The inventors here emphasize that an organic acid "in close contact with

the active" is to be avoided. Separation of the API from the acid is what avoids hydrolysis during

storage, not necessarily the complete absence of "any amount" of acids from the "first type of particles."

### iii.    The File Wrapper

The prosecution of the '729 Patent was extensive, and it included an appeal to the Board of Patent Appeals.[7] Nowhere in that record did the applicant, or any representative of the Patent Office, suggest that "free from" means "does not contain any amount of" the API and/or acid.

The term "free from" was added by amendment to the pending claims filed on April 16, 2018, in response to a rejection by the examiner who believed the claimed inventions to be obvious based largely upon the Brauns publication, U.S. 2006/0183779 ("US '779").[8] US '779 disclosed a dabigatran etexilate composition with a single population of pellets that separated the API from an acid core by an insulting layer that separated the API from an acid core.[9] The "free from" term was added to the pending claims to emphasize that the inventive compositions are a mixture of "at least two distinct types of particles," which was a completely different approach to separating API from acid in a formulation.[10]

The April 16, 2018 amendment, and the prosecution that ensued, provides no guidance as to the meaning of the clause "free from," other than to emphasize that the inventive compositions employed a different formulation design than was attempted in the prior art. Plaintiff is not otherwise aware of any information in the file wrapper that informs the meaning of the "free from" clauses.

---

[7] *See* Ex. C: '729 Patent Prosecution History, December 6, 2019 Appeal Brief (BR-DAB-00001403-14).

[8] *See* Ex. D: '729 Patent Prosecution History, April 16, 2018 Office Action Response at 2, 5-11 (BR-DAB-00001293, 1296-1302).

[9] *Id.* at 8 (BR-DAB-00001299).

[10] *Id.*

###         iv.      Analysis

The intrinsic record discloses various embodiments of inventive compositions that comprise a mixture of two types of particles, made in a manner that avoids contact between the API and the acids of each respective particle. *See* '729 patent, 3:63-4:67. The term "free from" has a plain meaning in this context, and it does not require construction.

However, should the Court disagree, the first type of particles clause should be construed to mean "the first type of particles does not contain organic acids and inorganic acids in contact with the dabigatran etexilate." This is consistent with the specification, and the prosecution of these claims.

In contrast, the intrinsic record does not support the position that the term "free from" in the "first particles" clause was intended to restrict the claimed compositions to a type of particle that "does not contain any amount of organic acids and inorganic acids," as Defendants contend. This is an unnecessarily narrow construction, inconsistent with the intrinsic record.

###        b.      ". . . and is free from dabigatran etexilate"

This term is recited in the second clause of each independent claim, defining the second type of particles with "at least one pharmaceutically acceptable organic acid, wherein the second type of particles is coated with a protective coating layer and is *free from* dabigatran etexilate." '729 Patent, claims 1 b), 11 b), and 16 b); '146 Patent, claims 1 b), 8 b), and 16 b) (emphasis added). The parties' positions are as follows:

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction Required.<br><br>Alternatively, "and does not contain dabigatran etexilate in contact with the organic acid." | "and does not contain any amount of dabigatran etexilate" |

Plaintiff incorporates herein its analysis of the "the first type of particles," set forth above. The same intrinsic record for that term supports the conclusion that ". . . and is free from dabigatran etexilate" also requires no construction. Alternatively, should the Court deem construction necessary, the term should be construed to similarly mean ". . .and does not contain dabigatran etexilate in contact with the organic acid." This construction is consistent with the intrinsic record for the same reasons set forth above for the "first particle" clause employing the term "free from."

### (2)    Hetero' Answering Position[11]

The dispute for these two terms is simple: does the "free from" term mean that the entire dabigatran particle is free from acid, and the entire acid particle is free from dabigatran. Having differentiated its claims from the prior art on the basis that the dabigatran and acid are not on the same particles, Breckenridge is now trying to capture instances where the particles rub against each other and that rubbing results in small flakes of dabigatran becoming embedded in acid particles, or vice versa.

To do so, as explained more below, Breckenridge ignores the plain meaning of "free from." Numerous cases have construed terms like "free from" to be consistent with "does not contain any amount of." Instead, Breckenridge basically attempts to add an "essentially" by relying on cherry-picked specification language and misleading summaries of the prosecution history to support its proposed construction. In contrast, as explained below, Hetero's proposed construction of "free

---

[11] Hetero identified the term "free from" pursuant to the Scheduling Order, while Breckenridge did not identify any term for construction. When Breckenridge was scheduled to provide its responsive constructions, Breckenridge instead sought to construe the larger terms "the first type of particles is free from" and "and is free from dabigatran etexilate." Hetero does not believe it is necessary or appropriate to construe the larger terms proposed by Breckenridge. Regardless of which term(s) the Court chooses to construe, Hetero's proposed construction is the same and applicable to the disputed terms identified by both parties.

from" is well-supported by the plain meaning of the words, the language and grammatical structure of the claims, the specification, and the prosecution history.

The Court should adopt Hetero's proposed construction.

### a. Breckenridge's construction is overbroad and unsupported by the intrinsic evidence.

Breckenridge raises three arguments in support of its proposed construction. All three fail. *First,* Breckenridge argues that Hetero's proposed construction is too narrow because the specification recites the claim language, less the "free from" limitation, as the scope of the invention. *See* Pl.'s Opening Br. at 35 ("Some embodiments broadly describe the mixture of the two types of particles, without using the term 'free from.'") (citing '729 Patent 4:24–39). But this argument makes no sense. There is no question that the asserted claims recite the "free from" language. So the fact that the specification may contain broader language is not material to understanding what the "free from" language means. Accordingly, the claims are clearly narrower than the embodiments Breckenridge cites. *See Gen. Elec. Co. v. Int'l Trade Com'n*, 685 F.3d 1034, 1041 (Fed. Cir. 2012) ("a possibly broader disclosure accompanied by an explicit narrow claim shows the inventor's selection of the narrow claim scope"). Indeed, it is well-established that patent claims are not required to encompass every embodiment disclosed in the specification. *See Oak Tech. Inc. v. Int'l Trade Com'n*, 248 F.3d 1316, 1329 (Fed. Cir. 2001) ("Specifications teach. Claims claim."); *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) (declining to expand the claim scope to encompass the preferred embodiments or other disclosed embodiments when patentee did not claim them).

What *does* matter is that the "free from" limitation was added in direct response to the examiner's rejections directed to the exact embodiments Breckenridge seeks to improperly recapture here: a formulation in which dabigatran and acid are present within the same particle.

*See* Ex. D at 10 ("Having all three components in a single particle was necessary for the invention of [US '779], and using two distinct particles as presently claimed [with the newly added 'free from' limitation] would destroy the invention of [US '779]."). *See also Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 34 (1966) ("Here, the patentee obtained his patent only by accepting the limitations imposed by the Examiner. The claims were carefully drafted to reflect these limitations and [the patentee] is not now free to assert a broader view of [the] invention."); *Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.*, No. 20-985-RGA, 2022 WL 1026983, at *2 (D. Del. Apr. 6, 2022) (holding that "'an applicant's argument that a prior art reference is distinguishable'" based on a particular negative limitation "'can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.'") (quoting *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013)).

*Second*, Breckenridge argues that the "free from" limitation means only that the dabigatran and acid cannot come into contact with each other, but its only support is an irrelevant excerpt from the specification. *See* Pl.'s Opening Br. at 35 ("The specification does, however, advise that 'the presence of an organic acid in close contact with the active' in a composition made 'without any special steps taken to separate the two from each other, can make the active highly susceptible to hydrolysis in the presence of humidity.'") (*quoting* '729 Patent 2:50–54). But this portion of the specification—from the background of the invention section of the specification—is no more than a summary of teachings in the prior art. Indeed, as explained below, Breckenridge disparaged and disclaimed prior art solutions to preventing hydrolysis that allowed dabigatran and acid on the same particle. *See infra* § II(B)(2)(b)(ii)–(iii).

*Third*, Breckenridge argues that the "free from" limitation was only added to "emphasize" the "two distinct particles" language that was already in the claim. Pl.'s Opening Brief at 36. As

40

an initial matter, Breckenridge's intent in adding the language is irrelevant to its meaning. *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008) ("In particular, we have explained that '[t]he subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim.'") (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995) (*en banc*)).

Next, as discussed above, the "free from" limitation was added over two years *after* the "distinct" limitation in response to entirely different arguments by the Examiner. *See supra* § II(A)(2)(b)(ii). The patent examiner rejected the claim in part because US '779 disclosed "more than two particles" used in a capsule, "and the instant claims do not make the distinction between the two types of particles being different." Ex. H at 7–8. In response, Breckenridge added the phrase "distinct" to the pending claims response. *See* Ex. E at 4. After several subsequent rejections, Breckenridge added the "free from" limitation "to more clearly recite particularly the present invention." Ex. D at 2, 5. The nature of this attempt to "more clearly recite" the claimed composition is clear from their contemporaneous arguments: Breckenridge added the "free from" limitation during prosecution *because* US '779 disclosed dabigatran compositions with acid and dabigatran on the same particle separated by a protective coating. *See* Ex. D at 8 ("Having all three components in a single particle was necessary for the invention of [US '779], and using two distinct particles as presently claimed [with the newly added 'free from' limitation] would destroy the invention of [US '779].").

### b.    The intrinsic evidence supports Hetero's construction.

The intrinsic evidence supports Hetero's proposed construction that the "free from" means that the *entire* dabigatran particle is free from acid and the *entire* acid particle is free from dabigatran, including the protective coating layer on the acid particle.

### i.    The claim language requires that the entire dabigatran particle must be "free from" acid, and vice versa.

The plain meaning of the phrase "free from" and similar terms has consistently been determined to mean "does not contain." For example, in *King Pharma. Inc. v. Purdue Pharma, L.P.*, the court construed a patent claim relating to an opioid antagonist composition, including a first layer of antagonist, a second layer of hydrophobic material, a protective coating and a limitation that the composition was "free from" an opioid antagonist. 718 F. Supp. 2d 703, 708–716  (W.D. Va. 2010). Similar to the structure of US '779, the claimed opioid antagonist composition in *King* was intended to serve as the inner layers of a multilayered particle with an unclaimed third layer of opioid agonist in some embodiments. *Id.* at 714–15. In other embodiments, the claimed composition is similar to Breckenridge's claimed composition containing two types of particles unclaimed opioid agonist particles and claimed opioid antagonist particles. *Id.* Similar to both US '779 and Breckenridge's claimed composition, the second layer of hydrophobic material was used to separate the agonist and antagonist. *Id.* at 714.

The *King* court held that the claim term "free from" meant "does not contain." *Id.* at 715. The court rejected the defendant's proposed construction in part because its "clarification of the phrase 'free from' to 'completely free of' seems even less necessary as the modifier 'completely' is *redundant*." *Id.* (emphasis added). Further, the court clarified that this limitation also applied to the second layer of hydrophobic material, which is analogous to the protective coating layer in Breckenridge's claimed composition. The court reasoned that "there is no question that the *entire* antagonist composition . . . is 'free from' *any* opioid agonist." *Id.* at 714 (emphasis added). *See also Cumberland Pharms. Inc. v. Sagent Agila LLC*, No. 12-825-LPS, 2013 WL 5913742, at *2 (D. Del. Nov. 1, 2013) ("No claim construction is necessary in order to determine that 'free from a chelating agent' means that a claimed composition may not include a chelating agent."); *Bioavail*

*Laby's Int'l SRL v. Impax Laby's., Inc.*, 433 F. Supp. 2d 501, 519 (E.D. Pa. 2006) ("[T]here is no reason not to apply the ordinary English meaning of 'free of' when construing 'free of stabilizer': 'not having or using'; 'lacking.'"). This case is no exception.

Additionally, the grammatical structure of the claims makes clear that the "free from" limitation operates on the *entire* dabigatran particle and the *entire* acid particle, including the claimed protective coating layer on the acid particle. For example, claim 1 of the '729 Patent recites, *inter alia*, that "the first type of particles is free from organic acids and inorganic acids" and "the second type of particles . . . is free from dabigatran etexilate." '729 Patent 16:9–19. According to a plain reading of the claim, it is "the first type of particles" and "the second type of particles" that are the grammatical subjects of both these phrases that are modified by the "free from" language. Thus, the plain meaning and structure of the claim language supports Hetero's proposed construction that the entire acid particle does not contain any dabigatran, and the entire dabigatran particle does not contain any acid.

### ii. The specification is clear that the dabigatran and acid to not be in contact, and disparages prior art solutions where the dabigatran and acid are on the same particle.

Not only does the claim language support Hetero's proposed construction, but the specification confirms that the "free from" limitation applies to the dabigatran particles and acid particles in their entirety. Indeed, the specification disparages prior art solutions where the dabigatran and acid are within the same particle. Where "patents distinguish the prior art" on the basis of a particular structure, and "point out the advantages of [that particular structure] . . . the claims should not be read so broadly as to encompass the distinguished prior art structure." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001). *See also Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015) (where "the

specification [] reveal[s] an intentional disclaimer, or disavowal, of claim scope by the inventor, . . . the inventor's intention, as expressed in the specification, is regarded as dispositive").

Here, the specification incorporates the teachings of the prior art that the dabigatran and acid should not come into contact in order to avoid degradation. *See* '729 2:4–15. Further, "special steps" must be taken to ensure that the dabigatran and acid do not come into contact. *Id.* 2:50–54. One such example of a prior art solution was US '779, which Breckenridge described as a "layered pellet" with the dabigatran and acid in different layers of the same pellet. *Id.* 2:30–44. Breckenridge goes on to disparage the manufacturing process for the US '779 composition as "cumbersome, time consuming and uneconomical." *Id.* 2:43–44. In contrast, Breckenridge characterizes its claimed composition as "stable" and "can be prepared by simple, non-tedious, and cost-effective process." Breckenridge further disparages the dabigatran compositions in the US '779 during prosecution, as explained below.

Where, as here, the asserted patents "[h]ave specifically identified, criticized, and disclaimed" a particular structure, courts routinely refuse to allow the patent owner to pursue infringement claims against that disclaimed structure. *See, e.g., SciMed*, 242 F.3d at 1345. Indeed, a person of ordinary skill reading the "free from" limitation in the claims in light of these disclosures together would immediately understand that Breckenridge intended to claim compositions where there was no amount of dabigatran in the acid particle, and vice versa. Breckenridge unequivocally disparaged the US '779 composition, which contains dabigatran and acid on the same particle (albeit separated by a protective coating layer). A comparison of the claim language with the specification's description of the US '779 multilayered particle leaves no doubt that the distinguishing characteristic between Breckenridge's claims and US '779 was that Breckenridge's claims did not allow the dabigatran and acid to be in the same particle.

44

iii. **Breckenridge told the Patent Office that its claim compositions did not have dabigatran and acid on the same particle.**

Breckenridge's statements during prosecution support Hetero's construction of "free from" meaning "does not contain any amount of" by explicitly disclaiming and amending its claims to exclude dabigatran particles with any amount of acid and acid particles with any amount of dabigatran. Breckenridge now seeks to recapture its disclaimed scope by proposing that "free from" only requires that the dabigatran and acid are not in contact with each other. But prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution" if a patentee "has unequivocally disavowed a certain meaning to obtain [a] patent" in a way that is "clear and unmistakable," and "narrows the ordinary meaning of the claim congruent with the scope of the surrender" *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324–26 (Fed. Cir. 2003). *See also Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1141 (Fed. Cir. 2021) ("The doctrine [of prosecution disclaimer] ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers."). "Prosecution disclaimer can arise from both claim amendments and arguments." *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1379–80 (Fed. Cir. 2021) ("An applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.").

Breckenridge added the "free from" limitation at the same time that it first argued separating the layers of the US '779 composition would "destroy the invention of [US '779]." *See* Ex. D at 6–8. Namely, Breckenridge argued to the Patent Office that "[h]aving all three components [acid, dabigatran, and protective coating layer] in a single particle was necessary for the invention of [US '779], and using two distinct particles as presently claimed [with the newly

45

added 'free from' limitation] would destroy the invention of [US '779]." *Id.* at 8. Thus, Breckenridge explicitly disclaimed any composition wherein the dabigatran, acid, and protective coating layer were present in the same particle, and memorialized that disclaimer with claim language requiring that the dabigatran particle is free from acid, and that the acid particle is free from dabigatran. *See Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) ("[W]hen the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered.").

Further, contrary to Breckenridge's litigation-driven narrative, there was no discussion of contact between the dabigatran and acid in Breckenridge's contemporaneous remarks. The reason is simple: preventing contact between the dabigatran and acid was already disclosed in US '779, and thus would not have distinguished the prior art. By contrast, the connection between Breckenridge's disclaimer and the "free from" limitation is clear. The "free from" limitation was added at the exact same time that Breckenridge disclaimed compositions wherein particles contained dabigatran, acid, and a protective coating layer, and speaks to the exact same narrowing of claim scope.

### (3)    Plaintiff's Reply

Hetero's Answering Brief reads as if it were a post-trial brief on the topic of infringement. Hetero's entire argument is predicated on the purely hypothetical scenario in which the particles of its formulation "rub against each other and that rubbing results in small flakes of dabigatran becoming embedded in acid particles, or vice versa." Dfs.' Answering Br. at 38. Hetero thus ask the Court to craft a claim construction that might provide for a non-infringement argument, in the event that (one day) the "small flakes" hypothetical presents itself. *Id.* This is another example of

why it is important for courts to resolve claim construction disputes "without the objective of capturing or excluding the accused device." *Vita-Mix Corp.*, 581 F.3d at 1324. An accused infringer's hopeful hypothetical scenario is no basis upon which to rewrite the scope of a patent claim, which (after all) is a presumptively valid property interest granted by the United States Patent Office. 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95-97 (2011).

Again, Breckenridge believes no construction of this term is necessary, as persons of ordinary skill in the art understand what "free from" means. If the Court disagrees and believes construction of the "free from" terms is necessary, the terms should be construed consistent with the intrinsic record, which teaches that the claimed formulation is designed to minimize contact between the dabigatran molecules and the acid molecules in the composition during storage. Hetero presents no good reason to write into the claim language the absolute language Hetero seeks.

### a.    The Intrinsic Record Does Not Support Hetero's Construction

Hetero's summary of the intrinsic record relating to the "free from" terms is incomplete and unreliable. Hetero ignores a teaching clearly spelled out in the specification that it is "the presence of an organic acid in close contact with the active" during storage that can cause the active to be "highly susceptible to hydrolysis in the presence of humidity." '729 patent, 2:50-54. The specification is explicit in its teaching that DEM molecules are stable in the solid state, but "predominantly undergo[] degradation by hydrolytic pathways in the presence of moisture," and are sensitive to acid. *Id.* at 2:22-25.

The inventors therefore also emphasized that prior formulation designs were "unlikely to remain stable over the shelf life of the product," and so there was a need to prepare compositions that "are stable," in addition to being easy to prepare. *Id.* at 2:55-61. The inventive compositions thus provide for both chemical and polymorphic stability during storage. *Id.* at 3:3-4. This is

achieved, in one embodiment, by preparing separate particles (one with acid and the other with API), and coating only the organic acid particles with a protective coating layer. *Id.* at 10:18-19. In another embodiment, only the particles with API are coated with a protective coating layer. *Id.* at 10:38-39. In either circumstance, uncoated particles are blended with coated particles, lubricated, and then filled into a capsule. *Id.* at 10:27-28; 10:48-49.

The inventors also emphasized during prosecution the improved chemical stability of the claimed compositions. Ex. E at 6 (BR-DAB-000000244). During prosecution, one of the inventors provided a declaration (dated December 29, 2015) with experimental evidence comparing compositions with a protective coating on one type of particle (the acid particle) to compositions without a protective coating on either type of particle. Ex. R at 1-4 (BR-DAB-00000252-255). The composition with a protective coating on one of the particles, after four weeks at elevated temperature and humidity conditions in a closed vials, were shown to have significantly lower impurity levels in the experiment than the composition without the protective coating on the acid particles. *Id.* at 2-3. The protective coating on the acid particles preserved the chemical stability in this experiment – not an absolute prohibition of any active ingredient molecule coming into contact with the coated acid particle.

Hetero's summary of the prosecution history also incorrectly suggests the inventors disclaimed "dabigatran particles with any amount of acid and acid particles with any amount of dabigatran." *See* Dfs.' Answering Br. at 51; *see also id.* at 52 (arguing "Breckenridge explicitly disclaimed any composition wherein the dabigatran, acid, and protective coating layer were present in the same particle"). Hetero is wrong.

There was no such disclaimer. As the Board of Patent Appeals concisely summarizes, Breckenridge correctly distinguished its invention from the prior art. *See* Ex. A. That prior art

48

employed a single particle design, separating the API and acid by an inert layer covering an acid core that was itself then encased in an API layer on the same particle. *Id.* at 2-3. If anything was disavowed by the inventors here, it was the single particle formulation of the prior art. The myriad of hypothetical scenarios that Hetero now rhetorically proffers was not discussed in the many exchanges between Breckenridge and the Patent Office during prosecution. Absent "a clear disavowal," a patentee is "free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning." *See Datacore Software*, 2023 WL 5207928 at *7-8 (citing *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1282 (Fed. Cir. 2017).

### b. Hetero's Resort to Other Patents Using "Free From" Is a Distraction

Hetero's reliance on how different courts have interpreted different patents using the phrase "free from" reveals nothing about how that term should be construed in this case. Each case has its own facts, and context, and each has little (if any) relevance to the dispute before the Court. However, *King Pharms. Inc. v. Purdue Pharma L.P.* is analogous, and does provide some useful guidance. 718 F. Supp. 2d 703 (W.D. Va. 2010).

The claims at issue in *King Pharms* were to compositions with multiple layers: an inert core, followed by a layer of an active ingredient (an opioid antagonist), followed by a hydrophobic layer designed to sequester the opioid antagonist from other parts of the composition. *Id.* at 706-707. The patent included the limitation: "the composition is free from" a second active ingredient, "an opioid agonist." *Id.*; *see also* U.S. Patent No. 7,658,939 at claims 1 and 2 (attached as Ex. S). Dependent claims concern an oral dosage form comprising the opioid antagonist composition of claim 1 and an opioid agonist, wherein the hydrophobic material separates the opioid antagonist from the opioid agonist. *See id.* at claim 4. The accused infringer sought to construe "an opioid

antagonist composition … free from an opioid agonist" to mean "a multilayered particle containing opioid antagonist and *completely free of opioid agonist at all times.*" *Id.* at 714 (*emphasis* added).

The Court in *King Pharms* rejected the accused infringer's construction, ruling "there is no basis for including the phrase 'at all times.'" *Id.* In its decision, the *King Pharms* Court recognized that "[i]f the inventors intended '*completely* free of,' they could have used that phrase just as easily, but they chose 'free from.'" *Id.* at 15. Accordingly, the *King Pharms* Court accepted the patentee's construction of "free from" as simply "does not contain." *Id.*

As with the patentee in *King Pharms*, had the Inventors of the Breckenridge patents intended the claimed particles to be limited by the phrase "does not contain any amount of," they surely could have used that phrase. The inventors, however, chose "free from." In *King Pharms*, the patent term "free from" was not construed to mean "*completely free of*," as the accused infringer had hoped. Here, there is also no good reason to construe "free from" to mean "does not contain *any amount of*," as Hetero now proposes. The words that an inventor chooses, and upon which the Patent Office predicated its examination and allowance, are owed appropriate deference. *See Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363,1374 (Fed. Cir. 2004) ("we must consider the word that the inventor actually chose and use the definitions of that term that are consistent with the written description."). Should the Court nevertheless deem construction is necessary, then Breckenridge's construction more closely aligns with the intrinsic record and captures the intended claim scope. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").

(4)    **Hetero's Sur-Reply**

The parties' competing constructions appear to be substantially similar. Under either construction, "free from," means the first type of particle does not contain any amount of the second type of particle, and vice versa. That is the only reasonable understanding of this phrase. Breckenridge's *arguments*, however, contravene its construction by improperly seeking to add some "wiggle room" where each particle could contain some amount of the other. That is not what Breckenridge disclosed and told the patent examiner. Patentees must be held to what they actually disclosed to the public. *See Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1325 (Fed. Cir. 2015) ("[T]he interested public has the right to rely on the inventor's statements made during prosecution . . ."). It is manifestly unfair for Breckenridge to describe its patent one way to the examiner to obtain allowance, but subsequently expand the scope of their patent to prove infringement. *See Traxcell Techs.*, 15 F.4th at 1141. The Court should reject the "wiggle room" for which Breckenridge argues.

a.    **The intrinsic evidence supports Hetero's construction.**

Notably, Breckenridge's own argument further supports Hetero's construction, arguing that the patent says "the presence of an organic acid in close contact with" dabigatran can cause it to degrade. Correct. This concern is one reason, *inter alia*, why Breckenridge's construction (which would permit some unspecified amount of dabigatran and acid to intermingle) is wrong. Hetero's construction serves to avoid this unwanted degradation. Answering Br. at 43–44.

Next, Breckenridge relies on a prosecution declaration and impurity data to argue that the inventors never intended "free from" to mean acid particles contain no dabigatran, and vice versa. This evidence is unavailing. *First*, the declaration and data were submitted to the patent examiner two years before the claims were amended to recite the "free from" language, rendering it

irrelevant to the term's meaning. *Second*, even if relevant, the declaration lacks evidence linking impurity data to dabigatran-acid contact.

### b. Breckenridge's prosecution disclaimer defeats its construction.

Given all the other supporting evidence, the Court need not find prosecution disclaimer in order to adopt Hetero's construction. But disclaimer is yet another reason to adopt Hetero's construction and reject Breckenridge's arguments. Breckenridge states there was no disclaimer of a composition that has a particle with all three components—dabigatran, acid, and a protective coating. But Breckenridge cannot retreat from its clear and unmistakable statement that "[h]aving all three components [acid, dabigatran, and protective coating layer] in a single particle was necessary for the invention of [US '779-prior art], and using two distinct particles as presently claimed [with the newly added 'free from' limitation] would destroy the invention of [US '779]." Ex. D at 8. Breckenridge made that argument to overcome the prior art rejection based on US '779, distinguishing its alleged invention as *not having* any particles that contain all three components (acid, protective coating, and dabigatran) to get its claims allowed. Answering Br. at 34. Breckenridge made those express concessions. *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1380 (Fed. Cir. 2021) ("An applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well."). Now, Breckenridge tells this Court a different story: that the claimed acid particles (which contain a protective coating) could now also contain some dabigatran—all three components—which Breckenridge distinguished during prosecution. The Court should hold Breckenridge accountable to its prior statements.

Breckenridge tries to cobble isolated parts of its specification to stretch the boundaries of its claims. But it is axiomatic that "there is no presumption, or any reason to assume, that everything disclosed in a patent specification has been invented by the patentee." *Aktiebolaget*

*Karlstads Mekaniska Werkstad v. U.S. Int'l Trade Comm'n*, 705 F.2d 1565, 1574 (Fed. Cir. 1983); *see also General Elec. Co. v. Int'l Trade Comm'n*, 685 F.3d 1034, 1041 (Fed. Cir. 2012) ("[A] possibly broader disclosure accompanied by an explicit narrow claim shows the inventor's selection of the narrow claim scope"). Thus, Breckenridge's unrelated broader disclosures cannot expand the scope of the "free from" limitation that was actually *claimed*, which was added years into prosecution and does not even appear in the specification.

        **c.    No district court, including in King Pharms, has agreed with Breckenridge's proposed construction.**

Breckenridge misinterprets *King Pharms. Inc. v. Purdue Pharma L.P.* to support its position. Central to *King Pharms.* was that the disputed claims encompassed multilayered particles (like US '779) so defendants' "completely free of" construction would have excluded an embodiment. 718 F. Supp. 2d 703, 708–716 (W.D. Va. 2010). Unlike defendants' construction there, Hetero's construction excludes no claimed embodiments. Additionally, *King Pharms.* rejected the "completely free of" construction because it was redundant, not because the opioid antagonist composition could include some amount of agonist, as Breckenridge suggests here. *Id.* at 714–715. Hetero's construction aligns with this ruling.

Finally, Breckenridge's reliance on *King Pharms.* suggests it is amenable to a construction where "free from" means "does not contain." Hetero could agree to such a construction, so long as the Court rejects Breckenridge's "wiggle room" attempt.

      **C.    The "mixing" and "a mixture of" Terms**

The claim terms concerning the "mixing," or "a mixture of" the components of the claimed compositions are within claims 6, 11, and 16 of the '729 Patent. Both terms are addressed together in this section.

### (1) "mixing the first type of particles and the second type of particles with the at least one pharmaceutically acceptable excipient" of Claim 6

Claim 6 is a multiple dependent claim to "a process for preparation of the composition according to claim 2, comprising the step of mixing the first type of particles and the second type of particles with the at least one pharmaceutically acceptable excipient." '729 Patent, claim 6. Claim 2 depends from claim 1, and it recites "the composition according to claim 1, further comprising at least one pharmaceutically acceptable excipient." *Id.*, claim 2. Claim 1 is drawn to a "composition comprising: a mixture of at least two distinct types of particles . . ." *Id.*, claim 6. The parties' positions are as follows:

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary.<br><br>Alternatively, "mixing two different types of particles and at least one pharmaceutically acceptable excipient." | Plain and Ordinary meaning, i.e., mixing (1) the first type of particles and the second type of particles with (2) the at least one pharmaceutically acceptable excipient that is external to the two types of particles |

### (2) "a mixture of [two distinct types of particles]" of Claims 11 and 16

Claim 11 is an independent claim to a composition "consisting of a mixture of two distinct types of particles and at least one pharmaceutically acceptable excipient . . .." *Id.*, claims 11 and 16. Claim 16 is also independent, claiming "[a] capsule containing a pharmaceutical composition consisting of a mixture of two distinct types of particles and at least one pharmaceutically acceptable excipient." The parties' positions are as follows:

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary.<br><br>Alternatively, "a mixture of two different types of particles and at least one pharmaceutically acceptable excipient." | Plain and Ordinary meaning, i.e., "a mixture consisting of (1) two distinct types of particles and (2) at least one pharmaceutically acceptable excipient that is external to the two types of particles." |

### (3)    Plaintiff's Opening Position

Like the other claims Defendants seek to re-write via these *Markman* proceedings, Plaintiff maintains the words used to describe "mixing," or "a mixture of" the types of particles of the claimed compositions do not require construction. All three claims employ common language that describe either a process for making the claimed compositions by mixing components (claim 6), or compositions that contain "mixtures of" the claimed components (claims 11 and 16). The plain language of all three claims defines compositions that may be made with "at least one pharmaceutically acceptable excipient" that is within (or part of) the particles of each claim. All three claims also allow for a composition that adds an additional excipient to the mixture of both particles that is external to those particles. The logical and grammatical structure of the claims themselves permit both possibilities – it does not mandate that the "at least one pharmaceutically acceptable excipient" only be "external to the two types of particles."

Should the Court deem a construction is necessary, the plain meaning should be as Plaintiff proposes for both terms, which (essentially) repeats Plaintiff's view of the plain meaning of "two distinct types of particles" in each respective clause that recites "mixing," or "a mixture of" those particles. This is consistent with the chosen claim language, and the specification.

### a.    The Claims

As set forth above, claim 6 depends from claim 2, which depends from claim 1. Claim 1 defines a composition that includes (but is not limited to)[12] a mixture of "at least two distinct types of particles," with one of those particles (the "second type") having an additional "a protective coating layer . . .." '729 patent, Claim 1. Claim 2 then further limits the composition of claim 1 by

---

[12] In Claim 1, the transitional term "comprising" is used with the indefinite article "a," which carries the well-stablished meaning of "one or more" of the elements that follow. *Nippon Shinyaku Co., Ltd. v. Sarepta Therapeutics, Inc.*, 2023 WL 4314485 (D. Del. July 3, 2023) at *4 (D. Del. July 3, 2023).

stating the composition "further comprises at least one pharmaceutically acceptable excipient." *Id.*, claim 2. The "at least one pharmaceutically acceptable excipient" recited in claim 2 need only be further included in the composition, it is not necessarily an excipient that is external to either type of particle.

Claim 6 then recites a process for preparing the composition of claim 2 "comprising the step of mixing the first type of particles and the second type of particles *with the at least one pharmaceutically acceptable excipient*" that is recited in claim 2. *Id.*, claim 6 (emphases added). The process of claim 6 requires only that the first and second types of particles are mixed together with a pharmaceutically acceptable excipient. It does not further require that the "at least one pharmaceutically acceptable excipient" be external to the two types of particles. That excipient surely may be external to the particles, but it is not a requirement of the claim.

Both claims 11 and 16 are independent claims, employing the transition "consisting of," a term of patent parlance that means the claimed invention "contains only what is expressly set forth in the claim" and "excludes any element[,] step, or ingredient not specified in the claim." *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.,* 831 F.3d 1350, 1358 (Fed. Cir. 2016). Claim 11 is drawn to a composition that has "a mixture" of the two particles (wherein the second type of particle is coated with a protective coating layer), "and at least one pharmaceutically acceptable excipient." Claim 16 is similar, except that it is requires a capsule that contains the same mixture. Nothing in either claim requires that the "at least one pharmaceutically acceptable excipient" mixed with the two particles be "external to" those particles. The excipient (or excipients) need only be a component of "a mixture of" the two particles.

### b. The Specification

The specification also does not limit the "at least one pharmaceutically acceptable excipient" recited in claims 6, 11, or 16 to one that is "external to" the two distinct types of

particles. To the contrary, the specification discloses a composition with a mixture of the two different types of particles, each of which could include binders, diluents, or lubricants in their respective manufacture. *Id.* at 4:38-44. And, each of the distinct types of particles could also be (as an option) coated with a protective coating layer. *Id.* at 3:29-39. When the two types of particles are then mixed together to be placed into a dosage form, the composition could also (optionally) include an additional "at least one pharmaceutically acceptable excipient," separate from the excipients that were used to make each of the two different types of particles. *Id.* at 4:24-29. Nothing in the specification requires the excipients used to be "external to" the two distinct types of particles.

### c.    Analysis

Put simply, Defendants again are attempting to write limitations into the claims that do not belong, and which contradict the plain language of the claims as issued. In contrast, Plaintiff's proposed plain meaning definition stays true to the claim language, and naturally aligns the "mixing" and "mixture of" clauses with the structure and language chosen by the inventors. Assuming construction is deemed necessary, the Defendants' litigation-inspired interpretation (one likely designed to support a non-infringement argument) should be rejected, and Plaintiff's adopted. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").

### (4)    Hetero's Answering Position

The dispute here is whether Breckenridge can enlarge its claims to capture Hetero's product, which contains only dabigatran and tartaric acid particles without any excipient that keeps those particles separate from one another.

Breckenridge's proposed construction is wrong because, not only does it ignore numerous unfavorable authority, it relies on selective claim language and specification excerpts to support its proposed construction. Hetero's proposed construction, to the contrary, is rooted in the grammatical structure of the claims and the working examples described in the specification.

The Court should adopt Hetero's proposed construction.

### a. Breckenridge's construction is overbroad and unsupported by the intrinsic evidence.

Breckenridge raises two arguments in support of its proposed construction. Both fail. *First,* Breckenridge argues that its claim scope is broader than Hetero's proposed construction because the word "external" does not appear in the claims. Pl.'s Opening Br. at 55–56. But this argument ignores the well-settled law on claim interpretation. "Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct component[s] of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (citations omitted). Indeed, other courts in this district have rejected arguments nearly identical to Breckenridge's position. *See, e.g.*, *Baxter Healthcare Corp. v. Nevakar Injectables, Inc.*, Nos. 12-1184-CJB, 21-1186-CJB, 2023 WL 4175261, at *4–5 (D. Del. Jun. 26, 2023) (holding that a claim's use of "chelating agent" and "norepinephrine or a salt thereof" is "at least an indicator that those are two distinct, separate components."). *See also Purdue Pharm. Prods. L.P. v. Actavis Elizabeth LLC*, No. 12-5311 (JLL)(JAD), 2015 WL 5032650, at *14 (D.N.J. Aug. 25, 2015) ("The phrase 'further comprising' signals that these claimed elements . . . are distinct components of the solid pharmaceutical composition.").

In the '729 Patent, claim 6 requires the mixture of the two distinct particles of claim 1, "further comprising" an excipient (claim 2), and then mixing the particles with *the* excipient claimed in claim 2. The logic is straightforward: if the excipient from claim 2 is already present in

the two particles, there is nothing to mix *with* the two distinct particles. *See e.g., Baxter*, 2023 WL 4175261 at *4. Claims 11 and 16 are independent claims but should be given the same effect as is evident from claim 6. Indeed, including the phrase "and at least one pharmaceutically acceptable excipient" demonstrates that it is separate from the two distinct particles. *Cf. id.* at *5 (reasoning that " terms like 'admixing' and 'combining'" one compound with another suggests that the second compound "is an entirely separate chemical compound as compared to the other ingredients with which it is being 'admix[ed]' or 'combin[ed].'"). The onus is on Breckenridge to cite intrinsic evidence demonstrating that this default rule of interpretation should not apply here, and it has not done so.

*Second*, Breckenridge argues that the specification discloses embodiments where a pharmaceutically acceptable excipient is within the two types of particles and embodiment where a pharmaceutically acceptable excipient is external to the two types of particles. Pl.'s Opening Br. at 57. But the specification excerpts Breckenridge cites are of no moment in construing the claim term at issue—except to highlight that the claims cover something different. Breckenridge notes that the specification discloses that a pharmaceutically acceptable excipient may be added to the first type of particles in one embodiment. *Id.* (citing 4:38–44). But, as explained above, the first type of particles is separately claimed, and the claim language requires that the first type of particles and the claimed pharmaceutically acceptable excipient be *mixed together*. Next, Breckenridge argues that the claimed pharmaceutically acceptable excipient may be part of a protective coating layer. Again, the claim language makes clear that a protective coating layer is part of one of the two types of particles, and is thus separately claimed. The claim language requires that the two types of particles and the claimed pharmaceutically acceptable excipient be mixed together.

The logic is as straightforward in the specification as it was in the claims: if the excipient already present in the two particles, there is nothing to mix *with* the two types of particles. Breckenridge's argument makes no sense.

### b. The intrinsic evidence supports Hetero's construction.

### i. The claims require an excipient external to the acid and dabigatran particles.

The plain meaning of the phrases "mixing [A] with [B]" and "a mixture of [A] and [B]" has consistently been determined to mean that A and B are separate before mixing. *See, e.g.*, *Baxter*, 2023 WL 4175261 at *4–5 (holding that a claim's use of "chelating agent" and "norepinephrine or a salt thereof" is "at least an indicator that those are two distinct, separate components."). *See also Purdue*, 2015 WL 5032650 at *14 ("The phrase 'further comprising' signals that these claimed elements . . . are distinct components of the solid pharmaceutical composition.").

As in those cases, the grammatical structure of the present claims makes clear that the claimed pharmaceutically acceptable excipients are external to the two types of particles. "Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct component[s] of the patented invention." *Becton*, 616 F.3d at 1254. In the '729 patent, claim 6 requires the mixture of the two distinct particles of claim 1, "further comprising" an excipient (claim 2), and then mixing the particles with *the* excipient claimed in claim 2. *See Purdue*, 2015 WL 5032650 at *14 ("The phrase 'further comprising' signals that these claimed elements . . . are distinct components of the solid pharmaceutical composition."). *See also Baxter*, 2023 WL 4175261 at *5 (reasoning that " terms like 'admixing' and 'combining'" one compound with another suggests that the second compound "is an entirely separate chemical compound as compared to the other ingredients with which it is being 'admix[ed]' or 'combin[ed].'").

Claims 11 and 16 are independent claims but should be given the same effect as is evident from claim 6. Indeed, including the phrase "and at least one pharmaceutically acceptable excipient" demonstrates that it is separate from the two distinct particles. *Baxter*, 2023 WL 4175261 at *5. Further, claims 13 and 18, which are dependent on claim 11 and 16, respectively, recite the limitation that the first type of particles "further comprises at least one pharmaceutically acceptable excipient." These dependent claims do not recite "*the* at least one pharmaceutically acceptable excipient" recited in the independent claim. Instead, they claim an additional excipient in one of the particles. Breckenridge's proposal plainly contradicts the plain language of the claims.

### ii. The specification confirms that the excipient is external to the two particles.

As with the claim language, the specification discusses two different types of excipients: those external to one of the two claimed particles and those internal to the two claimed particles. *Compare* '729 Patent 2:62–3:2 ("a mixture of at least two types of particles *and* optionally at least one pharmaceutically acceptable excipient") *with id.* 4:24–37 ("In a preferred embodiment . . . the first type of particles comprising dabigatran etexilate . . . *also* comprise at least one pharmaceutical excipient.") (emphasis added). These are two different embodiments and only the description of the external excipient embodiment matches the claim language in claims 6, 11, and 16. Thus, the plain and ordinary meaning of the claim terms only encompass excipients that are external to the two types of particles.

### (5) Plaintiff's Reply

The dispute over these terms, as with the other terms before this Court, is not about "whether Breckenridge can enlarge its claims to capture Hetero's product." Dfs.' Answering Br. at 64. The dispute is how a person of ordinary skill in the art would understand the terms "mixing,"

and "a mixture of," as recited in claims 6, 11, and 16 of the '729 Patent. Breckenridge contends that the intrinsic record establishes that these terms are well known and understood by those of skill in pharmaceutical formulation technology, and need not be construed.

In truth, Hetero again reveals (in its Answering Brief) its objective is to write language into the claim in an attempt to craft a defense to literal infringement. According to Hetero, its product "contains only dabigatran and tartaric acid particles without any excipient that keeps those particles separate from one another." *Id.* Thus, Hetero seeks to write into the claims a requirement that the claimed "at least one pharmaceutically acceptable excipient" must be "external to the two types of particles." *Id.* at 61. Hetero's construction does not seek to define the issued (and examined) claim terms, it only seeks to exclude Hetero's product from the patents' literal scope. Hetero's construction of these terms should also be rejected on this basis alone. *See Vita-Mix Corp.*, 581 F.3d 1317, 1324 (Fed. Cir. 2009).

Regardless, there is simply no support in the intrinsic evidence to support Hetero's proposed construction. And Hetero offers none. As explained below, claims 6, 11, and 16 are not merely limited to "external" excipients. The dependent claims, including the process claims, clarify the proper scope. Absent any intrinsic evidence to the patents at issue, Hetero relies on different cases involving different claim language and different patent specifications, and more unsupported rhetoric. Respectfully, the Court should reject Hetero's position on these terms.

### a.    The Claims

Breckenridge's Opening Brief sets forth the grammatical structure of each of claims 6, 11, and 16, and needs not to be repeated here. Hetero's Answering Brief relies largely upon how different courts have interpreted different patents, none of which says anything at all about how the 'mixing/mixture' terms in the patents-in-suit would be understood by a POSA.

As for Hetero's accompanying rhetoric, mixtures can be both homogenous (of the same kind) or heterogenous (consisting of different kinds). In a general sense, 'mixing [A] and [B] with [C]' implies each of [A], [B], and [C] are separate prior to mixing. However, the resulting mixture depends on input components and the mixing process: one could produce [D], a new homogenous item; one could produce a heterogenous mixture of [A-C] and [B-C]; one could produce [A-B] and [C]; etc. But there is no reason, in the specification, prosecution history, or claims, to suggest [C] must be *external* to [A] and [B] following mixing.

The process of claim 6 requires only that the first and second types of particles ([A] and [B]) be mixed together with a pharmaceutically acceptable excipient [C]. '729 Patent at Claim 6. It does not further require that the "at least one pharmaceutically acceptable excipient" be external to the two types of particles. Since claim 6 uses the transitional term "comprising," that excipient surely *may be* external to the particles, but it is not a requirement of the claim. As for claims 11 and 16, each claims a composition that is a mixture of two particles, and "at least one pharmaceutically acceptable excipient," which need not be "external to" those particles. The excipient(s) need only be a component of "a mixture of" the two particles.

### b.    The Specification

There is nothing in the specification to support Hetero's position that "the specification discusses two different types of excipients: those external to one of the two claimed particles and those *internal* to the two claimed particles." *Id.* at 43 (*emphasis* added). This alleged distinction does not appear in the claim language or the specification. The two portions of the specification to which Hetero points only confirm that multiple embodiments of the claimed invention were disclosed. *Id.* (citing '729 Patent 2:62–3:2 and 4:24–37). "A claim construction that 'excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.'" *Nippon Shinyaku Co., Ltd. v. Sarepta Therapeutics, Inc.*, C.A. No. 21-1015-GBW, 2023

WL 4314485 at *14 (D. Del. July 3, 2023) (quoting *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1378-79 (Fed. Cir. 2013)). Such evidentiary support is entirely absent from Hetero's Answering Brief.

### (6) Hetero's Sur-Reply

#### a. "mixing/mixture of" has no special meaning in the intrinsic evidence or the art.

Breckenridge urges the Court to ignore other courts' construction of similar terms but offers no intrinsic or extrinsic evidence showing that a POSA would interpret "mixing/mixture" differently from the plain and ordinary meaning consistently adopted by other courts. The reason is straightforward: the claim language is clear, the plain and ordinary meaning controls, and supports Hetero's construction. Breckenridge's unsupported claims about a POSA's understanding lack support and cannot override the established meaning.

#### b. Hetero's proposed construction does not exclude any embodiments.

Breckenridge wrongly contends that Hetero's construction excludes embodiments where the excipient is internal to the particle. Hetero's construction does not exclude any embodiment because excipients that are internal to the particle are separately claimed. For example, dependent claims 13 and 18, which depend from claims 11 and 16 respectively specifies "the first type of particles comprise at least one pharmaceutically acceptable excipient." That is, claim 6, 11, and 16 claim excipients external to the particles, and claims 13 and 18 claim excipients internal to the particle. Hetero's construction fully aligns with all embodiments in the specification and claims, leaving Breckenridge's distortion without merit.

RICHARDS, LAYTON & FINGER, P.A.

MORRIS JAMES LLP

/s/ Sara M. Metzler
Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
metzler@rlf.com

/s/ Cortlan S. Hitch
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Ave., Ste. 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Plaintiff Breckenridge
Pharmaceutical, Inc*

*Attorneys for Defendants
Hetero USA Inc., Hetero Labs III,
Hetero Labs Limited and
Camber Pharmaceuticals, Inc.*

May 5, 2025